**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: | ) |
| | ) Case No.: 09 B 39937 |
| EQUIPMENT ACQUISITION | ) |
| RESOURCES, INC. | ) |
| | ) |
| Debtor. | ) |
| | ) |
| WILLIAM A. BRANDT, JR., not | ) |
| individually but solely in his capacity as Plan | ) |
| Administrator for EQUIPMENT | ) |
| ACQUISITION RESOURCES, INC., | ) Case No. 12-cv-00271 |
| | ) |
| Plaintiff, | ) Hon. Edmund E. Chang |
| | ) |
| v. | ) |
| | ) |
| HORSESHOE HAMMOND, LLC, a/k/a | ) Jury Demanded |
| HORSESHOE CASINO HAMMOND, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES,
AND JURY DEMAND IN RESPONSE TO ADVERSARY COMPLAINT
FOR AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**

Defendant Horseshoe Hammond, LLC ("Defendant") submits its amended answer,
affirmative defenses, and jury demand in response to the adversary complaint (the "Complaint")
filed by William A. Brandt ("Plaintiff" or "Plan Administrator") not individually but solely in his
capacity as Plan Administrator for Equipment Acquisition Resources, Inc. (the "Debtor").

**ALLEGATIONS COMMON TO ALL COUNTS**

**I.    THE PARTIES**

1.      On or about October 23, 2009 (the "Petition Date"), the Debtor filed a Voluntary
Petition (the "Petition") under Chapter 11 of the United States Bankruptcy Code with the United
States Bankruptcy Court for the Northern District of Illinois. The Debtor formerly operated in
several buildings near its headquarters at 555 S. Vermont Street, Palatine, Illinois.

**ANSWER**:  Defendant admits that on the Petition Date, the Debtor filed the Petition under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Illinois.  Defendant lacks sufficient information to answer the remaining allegations of paragraph 1 and therefore denies them.

2.      On or about July 15, 2010, the United States Bankruptcy Court approved the Debtor's Second Amended Plan of Liquidation, pursuant to which the Debtor executed the Plan Administrator Agreement which named Brandt as Plan Administrator of the Debtor.

**ANSWER**:  Defendant admits the allegations in paragraph 2.

3.      HCH is a limited liability company with its principal place of business at 777 Casino Center Drive, Hammond, Indiana 46320. It is a gaming institution under the Caesars Entertainment Corporation umbrella.

**ANSWER**:  Defendant admits the allegations in paragraph 3.

## II.   JURISDICTION AND VENUE

4.       This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and internal operating procedure 15(a) of the Federal District Court for the Northern District of Illinois because this action is related to the underlying bankruptcy case of Equipment Acquisition Resources, Inc. which is pending before this Court and is a civil proceeding arising under § 544 and § 548 of the United States Bankruptcy Code.  This Court also has jurisdiction over this adversary proceeding pursuant to Section 105(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 7001(1).

**ANSWER**:  Defendant admits the allegations of paragraph 5.

5.      This is a core proceeding under 28 U.S.C. §157.  If for any reason this court determines that all or any portion of this proceeding is non-core, Brandt consents to the entry of a final order by this Court.

**ANSWER**:  Defendant admits that this is a core proceeding under 28 U.S.C. § 157, but following *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the Bankruptcy Court may not constitutionally enter a final judgment and thus Defendant denies that the Bankruptcy Court has the authority to enter a final judgment order.  Defendant does not consent to the entry of a final order by the Bankruptcy Court.  Defendant further has demanded a trial by jury and does not consent to the Bankruptcy Court conducting the trial.

6.     The chapter 11 bankruptcy case is pending before this Court.  Accordingly, venue of this adversary proceeding is proper in this Court under 28 U.S.C. § 1409(a).

**ANSWER**:  Defendant admits the allegations in paragraph 6.

### III.  BACKGROUND FACTS

7.     EAR was incorporated in 1997 under the laws of Illinois.  Under its business model, EAR was designed to operate as a refurbishes of special machinery, a manufacturer of high-end technology parts, and a process developer for the manufacturing of high-technology parts.  The bulk of EAR's stated revenue was derived from the refurbishing and selling high-tech machinery.  EAR was set up to purchase high-tech equipment near the end of its life-cycle at low prices relative to the cost of a new unit, and then refurbish the equipment for sale to end-users at substantial gross margins using a propriety process.  Eventually, EAR's apparent success came to an end, and the systematic abuse of EAR and wrongful conduct by its founder, Sheldon Player ("Player"), was revealed.  Investigation by Brandt uncovered that Player used EAR to support a Ponzi-like scheme that Player implemented for his personal enrichment.

**ANSWER**:     Defendant lacks sufficient information to answer the allegations in

paragraph 7 and therefore denies them.

8.     In the period from at least 2005 until October 8, 2009, the Debtor engaged in a massive fraud by which it sold equipment at inflated prices and leased the equipment back from various lenders.  The Debtor misrepresented the value of the equipment, and pledged certain equipment multiple times to secure the financing.  During this period of time, one or more of the officers, directors, and shareholders of the Debtor knew that the Debtor was engaged in the fraud.  The Debtor paid substantial amounts of money to its board of directors, officers, and others detailed below during this time.

**ANSWER**:     Defendant lacks sufficient information to answer the allegations in

paragraph 8 and therefore denies them.

9.     Player systematically and repeatedly caused EAR to enter into unnecessary and harmful financing and lease agreements related to over-valued machinery. As part of this fraudulent scheme, Player caused EAR to enter into financing and financing-type lease agreements with certain entities (the "Financial Entities") related to equipment that was allegedly owned by Machine Tools Direct, Inc. ("MTD"). However, MTD was a mere straw-man in Player's scheme.

**ANSWER**:     Defendant lacks sufficient information to answer the allegations in

paragraph 9 and therefore denies them.

10.     Many, if not all, of the sale invoices from MTD sent to the Financial Entities grossly overstated the value of the underlying equipment. Moreover, MTD "purchased" the

underlying equipment from EAR mere days before MTD sold the equipment to either EAR or the Financing Entity. In those instances, Player purportedly caused EAR to transfer title to the underlying equipment to MTD. MTD then sold that equipment to EAR (or the Financial Entity in the case of a lease) at an inflated purchase price. As a result of this scheme, Player caused EAR to lease equipment at a cost far in excess of its actual value.

**ANSWER**: Defendant lacks sufficient information to answer the allegations in paragraph 10 and therefore denies them.

11. At first glance, the transactions might appear beneficial to EAR due to increased sales revenue. However, EAR could not and did not benefit from these circular transfers since EAR paid far more for the equipment under the financing or lease agreements than it ever received via the sale to MTD. Moreover, Player's defalcations further prevented EAR from having the funds necessary to repay the related financing or lease obligations, thus requiring EAR to enter into an increasing number of these transactions in order to have sufficient funds to repay its current obligations. In effect, Player's misconduct amounted to a Ponzi-scheme where funds from later Financing Entities were used to repay EAR's obligations under earlier financing and lease obligations.

**ANSWER**: Defendant lacks sufficient information to answer the allegations in paragraph 11 and therefore denies them.

12. On information and belief, Player designed and executed the transactions at issue in order to benefit himself at EAR's expense. Player used EAR's funds to enrich himself by utilizing those assets to purchase real or personal property for his own benefit and through cash distributions from EAR. Player's scheme provided no benefit to EAR because it caused EAR to take on insurmountable debt while his defalcations simultaneously prevented EAR from having the funds necessary to pay its creditors. As a result, EAR has creditors holding millions of dollars in claims as a result of EAR's unpaid lease obligations.

**ANSWER**: Defendant lacks sufficient information to answer the allegations in paragraph 12 and therefore denies them.

13. On October 8, 2009, after it became apparent that the Debtor engaged in fraudulent activity, the members of the Debtor's board of directors and its officers, including Donna Malone ("Malone") and Mark Anstett ("Anstett"), resigned. The shareholders elected Brandt as the sole member of the board of directors and as the Chief Restructuring Officer. Brandt filed the bankruptcy petition to manage the Debtor's assets for the benefit of all creditors.

**ANSWER**: Defendant lacks sufficient information to answer the allegations in paragraph 13 and therefore denies them.

14.     Player is married to Malone and played an integral role in structuring and effectuating the transactions which constituted the fraud described above.  In addition, Player had the power, authority, and/or ability to sign checks on the Debtor's accounts.  The Debtor paid Player and Malone in excess of $17 million throughout the four year period prior to the Petition Date for their "work" effectuating the fraudulent scheme.  On information and belief, the money which the Debtor paid to Player and Malone was the source of the funds that Player and Malone (1) had on deposit in their personal bank accounts described below and (2) spent on themselves, including on gambling activities described below.

**ANSWER**:     Defendant lacks sufficient information to answer the allegations in paragraph 14 and therefore denies them.

15.     Player has been a regular customer at HCH since at least 2007.  During the period that Player gambled at HCH, HCH sought information from Central Credit, LLC, which provided HCH with gaming reports detailing at least eleven different casinos at which Player gambled and had accounts dating back to the 1970s. In addition, HCH performed multiple credit checks on Player, which he authorized, which showed accounts with banks, credit card companies, and retailers, among others. For the period from at least October, 2007 until after the Petition Date, Player regularly gambled at HCH, usually on multiple occasions each month.  In addition, Player advised HCH that his home address was 454 N. Aberdeen Street, Apartment 2S, Chicago, IL 60622.

**ANSWER**:  Defendant admits that: (a) Player was a customer on multiple occasions at Defendant's casino since 2007; (b) during the time period in which Player was a customer at Defendant's casino, Defendant sought information from Central Credit, LLC, which provided gaming reports to Defendant; (c) the gaming reports that Central Credit, LLC provided to Defendant listed at least eleven different casinos at which Player gambled and had accounts, and that the first of these accounts at different casinos was established in 1976; (d) on at least two occasions, Defendant obtained credit reports regarding Player, Player had authorized Defendant to obtain such credit reports, and such credit reports identified accounts Player maintained with banks, credit card companies, and retailers; (e) during the period from October 2007 through March 2010, Player regularly gambled at Defendant's casino, usually on multiple occasions each month; and (f) Player advised Defendant that his home address was 454 N. Aberdeen Street,

Apartment 2S, Chicago, IL 60622. Except as expressly admitted, Defendant denies the allegations of paragraph 15.

16. Player was such a good customer of HCH that it opened a line of credit for him (the "HCH Line of Credit"). In connection with the HCH Line of Credit, Player completed one or more application forms in which he identified EAR as his employer and represented an annual income of $400,000.00. On information and belief, Player sought the HCH Line of Credit some time in early 2007, and initially sought a credit limit of $450,000.00. On information and belief, HCH gave Player the HCH Line of Credit in an amount close to that amount. The HCH Line of Credit was revised upward on multiple occasions, at Player's request. The HCH Line of Credit appears to have peaked at approximately $520,000.00 some time in October, 2008 and then again in January, 2009, approximately eight months before Brandt was appointed the CRO of EAR. The terms of the HCH Line of Credit required him to settle any debts he had with HCH within twenty-eight (28) days.

**ANSWER**: Defendant admits that: (a) Defendant opened a line of credit ("HCH Line of Credit") for Player's benefit; (b) in connection with opening the HCH Line of Credit, Player completed at least one application form in which he represented "Equipment Acquisition E.A.R." as his employer and that his annual income was $400,000; (c) Player originally sought the HCH Line of Credit in March 2007; (d) the HCH Line of Credit was increased to its maximum amount of $520,000 in January 2009; and (e) the terms of the HCH Line of Credit required Player to settle his debts to Defendant within 28 days. Except as expressly admitted, Defendant denies the allegations of paragraph 16.

17. In addition, HCH records showed that Player engaged in substantial cash transactions, which resulted in the creation of currency transaction reports (CTRs), in 2007, 2008, 2009, and 2010.

**ANSWER**: Defendant admits that Player engaged in multiple cash transactions in 2008, 2009, and 2010. Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 17 and therefore denies them.

18. Malone was also a customer of HCH. HCH performed multiple credit checks on Malone, which she authorized, and gave her a line of credit which peaked at $30,000.00 in the fall of 2008. Malone gambled at HCH less frequently than Player, but she still went to HCH almost every month for the period from 2007 to the Petition Date.

**ANSWER**: Defendant admits that (a) Malone was a customer of Defendant's casino; (b) Defendant obtained at least two credit reports regarding Malone and that Malone authorized Defendant to obtain those reports; (c) Defendant provided Malone with a line of credit and that this line of credit was increased to its maximum amount of $30,000 in September 2008; (d) Malone gambled at Defendant's casino less frequently than Player; and (e) Malone visited Defendant's casino at least once each month for the period from September 2007 to the Petition Date.  Except as expressly admitted, Defendant denies the allegations of paragraph 18.

19.     Brandt's investigation has determined that on one occasion from October 23, 2007 to October 23, 2009, the two year period prior to the Petition Date, the Debtor made one transfer to HCH via a cashier's check so, on information and belief, Player, Malone, or others personally could engage in gambling and gaming activities at HCH.  The check was made payable to "Horseshoe Casino Hammond" and was from an EAR account ending in 5419 at Jackson State Bank & Trust. HCH accepted and deposited this check. The payment, from an account ending in 5419 at Jackson State Bank & Trust, was for $167,000.00.  Exhibit A to this Complaint sets forth that payment.

**ANSWER**:  Defendant admits that Exhibit A lists an alleged payment in the amount of $167,000.  Except as expressly admitted, Defendant denies the allegations of paragraph 19.

20.     Brandt's investigation has also determined that on forty-one occasions from October 23, 2007 to October 23, 2009, the two year period prior to the Petition Date, Player and/or Malone made transfers to HCH via check so, on information and belief, Player, Malone, or others personally could engage in gambling and gaming activities at HCH.  The checks were made payable to "Horseshoe Casino Hammond" and were from a joint Player/Malone account ending in 7462 at Jackson State Bank & Trust. HCH accepted and deposited the forty-one checks.

**ANSWER**:  Defendant admits that between October 23, 2007 and October 23, 2009, the two year period before the Petition Date, it received and cashed the following thirty-one (31) checks identified on Exhibit B to the Complaint, which were drawn on an account maintained jointly in the name of Player and Malone and ending in 7462 at Jackson State Bank & Trust:

| Alleged Date[1] | Amount |
|---|---|
| 11/16/07 | $193,500.00 |
| 11/02/07 | $100,000.00 |
| 12/09/07 | $194,000.00 |
| 11/06/07 | $5,000.00 |
| 11/02/07 | $10,000.00 |
| 05/11/08 | $125,000.00 |
| 02/10/08 | $10,000.00 |
| 04/19/08 | $100,000.00 |
| 04/19/08 | $100,000.00 |
| 04/27/08 | $5,000.00 |
| 04/30/08 | $100,000.00 |
| 03/11/08 | $47,000.00 |
| 03/11/08 | $100,000.00 |
| 03/11/08 | $15,000.00 |
| 12/21/07 | $5,000.00 |
| 01/27/08 | $100,000.00 |
| 01/27/08 | $98,000.00[2] |

---

[1] The "Date" column refers to the date listed on Exhibit B to the Complaint to clarify which of the alleged transfers Defendant admits to receiving. Defendant does not admit that these dates are the actual dates on which the checks were drawn, cashed, or cleared.

[2] Exhibit B incorrectly lists this payment as being in the amount of $97,000.00; the correct amount is $98,000.00. To the extent that Plaintiff continues to assert that Defendant received a separate payment dated January 27, 2008 in the amount of $97,000.00, Defendant denies that allegation.

| | |
|---|---|
| 02/10/08 | $100,000.00 |
| 01/27/08 | $15,000.00 |
| 02/10/08 | $64,000.00 |
| 06/06/08 | $167,000.00 |
| 03/26/08 | $105,000.00 |
| 03/26/08 | $50,000.00 |
| 01/07/08 | $100,000.00 |
| 01/07/08 | $145,000.00 |
| 05/25/08 | $54,000.00 |
| 05/25/08 | $15,000.00 |
| 05/25/08 | $151,000.00 |
| 05/24/08 | $100,000.00 |
| 05/16/08 | $105,000.00 |
| 05/16/08 | $100,000.00 |

Defendant states that the checks associated with the foregoing transfers speak for themselves and denies anything inconsistent therewith

Defendant lacks sufficient information to admit or deny whether, between October 23, 2007 and October 23, 2009, the two year period before the Petition Date, it received and cashed the following ten (10) checks identified on Exhibit B to the Complaint, which were allegedly drawn on an account maintained jointly in the name of Player and Malone and ending in 7462 at Jackson State Bank & Trust, and therefore Defendant denies receiving and cashing the following ten (10) checks:

| Alleged Date | Amount |
| --- | --- |
| 03/16/08 | $5,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $7,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $7,000.00 |
| 02/10/08 | $5,000.00 |
| 02/14/08 | $5,000.00 |

Defendant lacks sufficient information to admit or deny the allegations of paragraph 20 and therefore denies them.

21.    The aggregate amount of the payments within the two year period prior to the Petition Date, October 23, 2007 to October 23, 2009, from the Player/Malone account ending in 7462 at Jackson State Bank & Trust was $2,631,500.00.

**ANSWER**:  Defendant admits that between October 23, 2007 and October 23, 2009, the two year period before the Petition Date, it received an aggregate amount of at least two million, five hundred seventy-eight thousand, five hundred dollars ($2,578,500.00) in payments from the account maintained jointly in the name of Player and Malone and ending in 3094 at Norstates Bank.  Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 21 and therefore denies them.

22.    Brandt's investigation has also determined that on thirty-eight other occasions from October 23, 2007 to October 23, 2009, the two year period prior to the Petition Date, Player

made transfers to HCH via check so, on information and belief, Player, Malone, or others personally could engage in gambling and gaming activities at HCH. The checks were made payable to "HCH" and were from a Player account ending in 3094 at Norstates Bank. HCH accepted and deposited the thirty-eight checks.

**ANSWER**: Defendant admits that between October 23, 2007 and October 23, 2009, the two year period before the Petition Date, it received and cashed the following thirty-eight (38) checks identified on Exhibit B to the Complaint, which were drawn on an account maintained in Player's name and ending in 3094 at Norstates Bank:

| Alleged Date[3] | Amount |
|---|---|
| 8/27/2008 | $100,000.00 |
| 9/4/2008 | $100,000.00 |
| 9/30/2008 | $180,000.00 |
| 9/30/2008 | $50,000 |
| 10/20/2008 | $335,000 |
| 10/20/2008 | $100,000.00 |
| 1/6/2009 | $250,000.00 |
| 1/27/2009 | $105,000.00 |
| 2/13/2009 | $200,000.00 |
| 3/9/2009 | $95,000.00 |
| 3/17/2009 | $75,000.00 |
| 3/27/2009 | $20,000.00 |
| 4/30/2009 | $57,000.00 |

[3] The "Date" column refers to the date listed on Exhibit B to the Complaint to clarify which of the alleged transfers Defendant admits to receiving. Defendant does not admit that these dates are the actual dates on which the checks were drawn, cashed, or cleared.

| | |
|---|---|
| 5/27/2009 | $200,000.00 |
| 5/27/2009 | $167,000.00 |
| 6/23/2009 | $165,000.00 |
| 6/23/2009 | $100,000.00 |
| 7/7/2009 | $45,000.00 |
| 8/11/2009 | $359,000.00 |
| 8/11/2009 | $100,000.00 |
| 8/24/2009 | $110,500.00 |
| 7/9/2008 | $317,000.00 |
| 9/24/2008 | $220,000.00 |
| 9/24/2008 | $100,000.00 |
| 4/28/2009 | $25,000.00 |
| 8/28/2008 | $279,000.00 |
| 1/8/2009 | $100,000.00 |
| | $5,000.00 |
| 2/5/2009 | $125,000.00 |
| 2/25/2009 | $5,000.00 |
| 2/23/2009 | $5,000.00 |
| 2/23/2009 | $5,000.00 |
| 2/25/2009 | $5,000.00 |
| 3/3/2009 | $140,000.00 |
| 3/9/2009 | $15,000.00 |

| 4/28/2009 | $25,000.00 |
| 6/26/2009 | $48,000.00 |
| 6/30/2009 | $53,000.00 |

Defendant states that the checks associated with the foregoing transfers speak for themselves and denies anything inconsistent therewith. Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 22 and therefore denies them.

23. The aggregate amount of the payments within the two year period prior to the Petition Date, October 23, 2007 to October 23, 2009, from the Player account ending in 3094 at Norstates Bank was $4,385,500.00.

**ANSWER**: Defendant admits the allegations of paragraph 23.

24. Brandt's investigation has also determined that on eleven other occasions from October 23, 2007 to October 23, 2009, the two year period prior to the Petition Date, Malone made transfers to HCH via check so, on information and belief, Player, Malone, or others personally could engage in gambling and gaming activities at HCH. The checks were made payable to either "Horseshoe Casino Hammond" or "HCH" and were from a Malone account ending in 6409 at Bank of Jackson Hole. HCH accepted and deposited the eleven checks.

**ANSWER**: Defendant admits that between October 23, 2007 and October 23, 2009, the two year period before the Petition Date, it received and cashed the following eleven (11) checks identified on Exhibit B to the Complaint, which were drawn on an account maintained in Malone's name and ending in 6409 at Bank of Jackson Hole:

| Alleged Date[4] | Amount |
| 7/28/2008 | $15,000.00 |
| 9/18/2008 | $22,000.00 |
| 8/10/2009 | $5,000.00 |

---

[4] The "Date" column refers to the date listed on Exhibit B to the Complaint to clarify which of the alleged transfers Defendant admits to receiving. Defendant does not admit that these dates are the actual dates on which the checks were drawn, cashed, or cleared.

| | |
|---|---|
| 9/18/2008 | $8,000.00 |
| 10/16/2008 | $5,000.00 |
| 11/18/2008 | $2,000.00 |
| 11/18/2008 | $3,000.00 |
| 11/22/2008 | $5,000.00 |
| 11/22/2008 | $5,000.00 |
| 11/22/2008 | $5,000.00 |
| 11/22/2008 | $5,000.00 |

Defendant states that the checks associated with the foregoing transfers speak for themselves and denies anything inconsistent therewith.

Defendant further states that, in contrast to the allegations of paragraph 24, Exhibit B purports to list thirteen (13) alleged checks dated between October 23, 2007 and October 23, 2009, which were allegedly drawn on an account maintained in Malone's name and ending in 6409 at Bank of Jackson Hole. Defendant believes that the following two (2) alleged payments identified on Exhibit B are duplicates and were mistakenly included on Exhibit B:

| Alleged Date | Amount |
|---|---|
| 8/14/2009 | $5,000.00 |
| 11/22/2008 | $5,000.00 |

To the extent Plaintiff alleges that Defendant received and cashed the two (2) foregoing checks, Defendant denies that allegation.

Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 24 and therefore denies them.

25.     The aggregate amount of the payments within the two year period prior to the Petition Date, October 23, 2007 to October 23, 2009, from the Malone account ending in 6409 at Bank of Jackson Hole was $80,000.00.

**ANSWER**:  Defendant admits the allegations of paragraph 25.

26.     Exhibit B to this Complaint sets forth the ninety payments described in paragraphs Twenty (20) through Twenty-Five (26) totaling $7,097,000.00.

**ANSWER**:  Defendant denies the allegations of paragraph 26.  Defendant further states

that Exhibit B to the Complaint identifies ninety-two (92) alleged payments that are of the type

described in paragraphs Twenty (20) through Twenty-Five (26) totaling $7,107,000.00; however,

as discussed in Defendant's response to paragraph 24, Defendant understands that two (2) of the

alleged payments identified on Exhibit B are duplicates and were inadvertently included on

Exhibit B and, as discussed in Defendant's response to paragraph 20, Defendant understands that

Plaintiff inadvertently listed the amount of the January 27, 2008 transfer as being in the amount

of $97,000 instead of $98,000.

To the extent that paragraph 26 alleges that Defendant received and cashed the ninety

(90) payments described in paragraphs twenty (20) through twenty-five (25) and that such

payments totaled $7,097,000.00, Defendant denies the allegations of paragraph 26.  Defendant

further states that it received and cashed eighty (80) payments of the type described in

paragraphs twenty (20) through twenty-five (25), totaling seven million, forty-four thousand

dollars ($7,044,000.00).

27.     In addition, Brandt's investigation has determined that on two occasions in the two year period from October 23, 2005 to October 23, 2007, the Debtor made transfers to HCH via check so, on information and belief, Player, Malone, or others personally could engage in gambling and gaming activities at HCH.  The checks were made payable to "Horseshoe" or "Horseshoe Casino" and were from an EAR account ending in 9808 at Charter One Bank. HCH accepted and deposited these checks.

**ANSWER**:  Defendant admits that between October 23, 2005 and October 23, 2007, it

accepted and deposited two checks, in the amounts of $25,000 and $5,000, drawn on an EAR

account ending in 9808 at Charter One Bank. Defendant states that the checks speaks for themselves and denies anything inconsistent therewith. Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 27 and therefore denies them.

28.     The aggregate amount of the payments from October 23, 2005 to October 23, 2007 was $30,000.00.   Exhibit C to the Complaint sets forth the two payments totaling $30,000.00.

**ANSWER**:  Defendant admits that between October 23, 2005 and October 23, 2007, Defendant received the two payments identified in Defendant's response to paragraph 27, that those two payments totaled $30,000, and that Exhibit C to the Complaint sets forth those two payments.

29.     The Debtor did not receive any value for the transfers contained on Exhibits A, B, or C.

**ANSWER**: Defendant denies the allegations in paragraph 29.

30.     The transfers listed on Exhibits A and C were transfers of interests of the Debtor in property.  HCH was the initial transferee.

**ANSWER**:  Defendant admits that (a) the transfers listed on Exhibits A and C were transfers of the interests of the Debtor in property, and (b) Defendant was the initial transferee of the transfers listed on Exhibit C.  Except as expressly admitted, Defendant denies the allegations of paragraph 30.

31.     The transfers listed on Exhibit B were transfers of interests of the Debtor in property. Player and/or Malone was the initial transferee, and HCH was the immediate transferee of the initial transferee.

**ANSWER**:  Defendant denies the allegations of paragraph 31.

## COUNT I
## (Fraudulent Transfer -11 U.S.C. §§ 548 and 550)

1-31. Plaintiff restates and realleges Paragraphs One (1) through Thirty-One (31) of the Allegations Common to All Counts as Paragraphs One (1) through Thirty-One (31) of this Count I.

**ANSWER**:  Defendant repeats and realleges its responses to each and every allegation contained in paragraphs 1 through 31, as though fully set forth herein.

32.     The transfer identified on Exhibit A was made by the Debtor to HCH within the two year period prior to the Debtor's bankruptcy filing.

**ANSWER**:  Defendant denies the allegations of paragraph 32.

33.     The Debtor received less than reasonably equivalent value for the transfer identified on Exhibit A.

**ANSWER**:  Defendant lacks sufficient information to admit or deny the allegations of paragraph 33 and therefore denies them.

34.     On the date of the transfer listed on Exhibit A, the Debtor either was insolvent, or was engaged in a business for which any property remaining with the Debtor was unreasonably small capital, or intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

**ANSWER**:  Defendant lacks sufficient information to answer the allegations of paragraph 34 and therefore denies them.

35.     The Debtor is entitled to avoid the transfers on Exhibit A pursuant to 11 U.S.C. § 548(a)(1)(B) and recover those transfers pursuant to 11 U.S.C. § 550.

**ANSWER**:  Defendant denies the allegations of paragraph 35.

**COUNT II**
**(Fraudulent Transfer -11 U.S.C. §§ 548(a)(1)(A) and 550)**

1-35. Plaintiff restates and realleges Paragraphs One (1) through Thirty-Five (35) of Count I as Paragraphs One (1) through Thirty-Five (35) of this Count II.

**ANSWER**:  Defendant repeats and realleges its responses to each and every allegation contained in paragraphs 1 through 35, as though fully set forth herein.

36.     The transfers identified on Exhibit B were made by Player and/or Malone to HCH within the two year period prior to the Debtor's bankruptcy filing.

**ANSWER**: Defendant admits that the following eighty (80) transfers identified on Exhibit B were made by Player and/or Malone to Defendant within the two-year period prior to the Debtor's bankruptcy filing.

| Alleged Date[5] | Amount |
|---|---|
| 11/16/07 | $193,500.00 |
| 11/02/07 | $100,000.00 |
| 12/09/07 | $194,000.00 |
| 11/06/07 | $5,000.00 |
| 11/02/07 | $10,000.00 |
| 05/11/08 | $125,000.00 |
| 02/10/08 | $10,000.00 |
| 04/19/08 | $100,000.00 |
| 04/19/08 | $100,000.00 |
| 04/27/08 | $5,000.00 |
| 04/30/08 | $100,000.00 |
| 03/11/08 | $47,000.00 |
| 03/11/08 | $100,000.00 |
| 03/11/08 | $15,000.00 |
| 12/21/07 | $5,000.00 |
| 01/27/08 | $100,000.00 |

---

[5] The "Date" column refers to the date listed on Exhibit B to the Complaint to clarify which of the alleged transfers Defendant admits to receiving. Defendant does not admit that these dates are the actual dates on which the checks were drawn, cashed, or cleared.

| | |
|---|---|
| 01/27/08 | $98,000.00[6] |
| 02/10/08 | $100,000.00 |
| 01/27/08 | $15,000.00 |
| 02/10/08 | $64,000.00 |
| 06/06/08 | $167,000.00 |
| 03/26/08 | $105,000.00 |
| 03/26/08 | $50,000.00 |
| 01/07/08 | $100,000.00 |
| 01/07/08 | $145,000.00 |
| 05/25/08 | $54,000.00 |
| 05/25/08 | $15,000.00 |
| 05/25/08 | $151,000.00 |
| 05/24/08 | $100,000.00 |
| 05/16/08 | $105,000.00 |
| 05/16/08 | $100,000.00 |
| 8/27/2008 | $100,000.00 |
| 9/4/2008 | $100,000.00 |
| 9/30/2008 | $180,000.00 |
| 9/30/2008 | $50,000 |
| 10/20/2008 | $335,000 |

[6] Exhibit B incorrectly lists this payment as being in the amount of $97,000.00; the correct amount is $98,000.00.  To the extent that Plaintiff continues to assert that Defendant received a separate payment dated January 27, 2008 in the amount of $97,000.00, Defendant denies that allegation.

| | |
|---|---|
| 10/20/2008 | $100,000.00 |
| 1/6/2009 | $250,000.00 |
| 1/27/2009 | $105,000.00 |
| 2/13/2009 | $200,000.00 |
| 3/9/2009 | $95,000.00 |
| 3/17/2009 | $75,000.00 |
| 3/27/2009 | $20,000.00 |
| 4/30/2009 | $57,000.00 |
| 5/27/2009 | $200,000.00 |
| 5/27/2009 | $167,000.00 |
| 6/23/2009 | $165,000.00 |
| 6/23/2009 | $100,000.00 |
| 7/7/2009 | $45,000.00 |
| 8/11/2009 | $359,000.00 |
| 8/11/2009 | $100,000.00 |
| 8/24/2009 | $110,500.00 |
| 7/9/2008 | $317,000.00 |
| 9/24/2008 | $220,000.00 |
| 9/24/2008 | $100,000.00 |
| 4/28/2009 | $25,000.00 |
| 8/28/2008 | $279,000.00 |
| 1/8/2009 | $100,000.00 |

|  |  |
| --- | --- |
|  | $5,000.00 |
| 2/5/2009 | $125,000.00 |
| 2/25/2009 | $5,000.00 |
| 2/23/2009 | $5,000.00 |
| 2/23/2009 | $5,000.00 |
| 2/25/2009 | $5,000.00 |
| 3/3/2009 | $140,000.00 |
| 3/9/2009 | $15,000.00 |
| 4/28/2009 | $25,000.00 |
| 6/26/2009 | $48,000.00 |
| 6/30/2009 | $53,000.00 |
| 7/28/2008 | $15,000.00 |
| 9/18/2008 | $22,000.00 |
| 8/10/2009 | $5,000.00 |
| 9/18/2008 | $8,000.00 |
| 10/16/2008 | $5,000.00 |
| 11/18/2008 | $2,000.00 |
| 11/18/2008 | $3,000.00 |
| 11/22/2008 | $5,000.00 |
| 11/22/2008 | $5,000.00 |
| 11/22/2008 | $5,000.00 |
| 11/22/2008 | $5,000.00 |

Defendant lacks sufficient information to admit or deny whether the following ten (10) payments identified on Exhibit B were made by Player and/or Malone to Defendant within the two-year period prior to the Debtor's bankruptcy filing, and therefore Defendant denies receiving the following payments: .

| Alleged Date | Amount |
| --- | --- |
| 03/16/08 | $5,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $7,000.00 |
| 02/10/08 | $5,000.00 |
| 02/10/08 | $7,000.00 |
| 02/10/08 | $5,000.00 |
| 02/14/08 | $5,000.00 |

Defendant denies the remaining allegations of paragraph 36.

37. The Debtor voluntarily or involuntarily made the transfers identified on Exhibit B with actual intent to hinder, delay, or defraud the many lessors to which the Debtor was indebted as a result of the fraudulent scheme.

**ANSWER**: Defendant denies the allegations of paragraph 37.

38. As a result of the transfers identified on Exhibit B in part, the lessor creditors of EAR were hindered, delayed, and defrauded in any efforts they could have made to receive payment for their leases.

**ANSWER**: Defendant denies the allegations of paragraph 38.

39.    HCH did not take the transfers listed on Exhibit B in good faith. At the time that HCH accepted those transfers, it had knowledge (1) that Player was a compulsive gambler who had open accounts at numerous casinos with six-figure credit limits at more than one of those other casinos; (2) that Player had sought a high credit limit, and requested higher limits on a regular basis; (3) that both Player and EAR made substantial transfers to HCH to cover the gambling losses of Player and Malone; and (4) that Player and Malone gambled at other casinos under the Caesars Entertainment umbrella, including the Rio Hotel in Las Vegas, Nevada.

**ANSWER**: Defendant admits that it had knowledge that (a) Player had opened accounts at other casinos and that Player had a six-figure credit limit at more than one of those other casinos; (b) Player requested on multiple occasions that Defendant increase Player's HCH Line of Credit; (c) Player made transfers to Defendant to cover Player's gambling losses; and (d) Player and Malone gambled at other casinos under the Caesars Entertainment umbrella (then the Harrah's Entertainment umbrella), including the Rio hotel in Las Vegas, Nevada.  Except as expressly admitted, Defendant denies the allegations of paragraph 39.

40.    In conjunction with all of its knowledge about Player's serious gambling problem, as well as the obligations reflected on his credit report, Player told HCH that he worked at EAR in Palatine, Illinois and claimed $400,000.00 of income per year and assets of $30,000,000.00. Yet in spite of this, HCH allowed Player to gamble and lose nearly twenty times his annual income in a period of less than two years.

**ANSWER**:  Defendant admits that Player informed Defendant that he (a) was employed at EAR in Palatine, Illinois; (b) had an annual income of $400,000; and (c) assets of $30,000,000.00, not including his mortgage indebtedness.  Except as expressly admitted, Defendant denies the allegations of paragraph 40.

41.    HCH did not take any steps to confirm (1) whether Player could possibly have legitimate assets sufficient to cover his personal gambling debts; or (2) whether Player had ever spent time in federal prison for crimes consistent with a business operating a fraudulent scheme.

**ANSWER**: Defendant admits that it did not make a formal inquiry into whether Player had ever spent time in federal prison for crimes consistent with a business operating a fraudulent scheme.  Except as expressly admitted, Defendant denies the allegations of paragraph 41.

42.    In addition, the transfer listed on Exhibit A, which EAR made to pay Player's personal gambling debt at HCH, demonstrates that at least as of June 6, 2008, the date of that transfer, HCH knew that Player was willing and/or able to have his employer pay his personal gambling debt in the amount of $167,000.00. This was a change in the way that Player paid his personal gambling debt to HCH.

**ANSWER**:  Defendant denies the allegations of paragraph 42.

43.    Further, for the period until June, 2008, Player's line of credit at HCH was no higher than $300,000.  After EAR made the payment on Exhibit A, then HCH began increasing the credit line rapidly, as high as $520,000.00 by October, 2008.  Thus, even though Player supposedly had $30,000,00000 in assets, a figure which HCH did not independently verify, HCH accepted a payment from EAR for Player's personal gambling debts and then increased his line of credit.

**ANSWER**: Defendant admits that Player's HCH Line of Credit was increased to its

maximum amount of $520,000 in January 2009.  Except as expressly admitted, Defendant denies

the allegations of paragraph 43.

44.    On information and belief, HCH increased Player's credit line once it knew that it funds from EAR, Player's employer, potentially available to pay for his personal gambling debts.

**ANSWER**:  Defendant denies the allegations in paragraph 44.

45.    The Debtor is entitled to avoid the transfers on Exhibit A pursuant to 11 U.S.C. § 548(a)(1)(A) and recover those transfers pursuant to 11 U.S.C. § 550.

**ANSWER**:  Defendant denies the allegations in paragraph 45.

### COUNT III
### (Fraudulent Transfer -11 U.S.C. §§ 548(a)(1)(B) and 550)

1-45.   Plaintiff restates and realleges Paragraphs One (1) through Forty-Five (45) of Count II as Paragraphs One (1) through Forty-Five (45) of this Count III.

**ANSWER**:  Defendant repeats and realleges its responses to each and every allegation

contained in paragraphs 1 through 45, as though fully set forth herein.

46.    The transfers identified on Exhibit B were made by Player and/or Malone to HCH within the two year period prior to the Debtor's bankruptcy filing.

**ANSWER**: Defendant repeats and realleges its response to the allegations of paragraph 36, as though fully set forth herein.

47.     The Debtor received less than reasonably equivalent value for the transfers identified on Exhibit B.

**ANSWER**:  Defendant denies the allegations of paragraph 47.

48.     On the date of the transfers listed on Exhibit B, the Debtor either was insolvent, or was engaged in a business for which any property remaining with the Debtor was unreasonably small capital, or intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

**ANSWER**:  Defendant lacks sufficient information to answer the allegations of paragraph 48 and therefore denies them.

49.     The Debtor is entitled to avoid the transfers on Exhibit A pursuant to 11 U.S.C. § 548(a)(1)(B) and recover those transfers pursuant to 11 U.S.C. § 550.

**ANSWER**:  Defendant denies the allegations of paragraph 49.

### COUNT IV
### (Fraudulent Transfer -11 U.S.C. § 544 and 740 ILCS 160/5(a)(2))

1-49.   Plaintiff restates and realleges Paragraphs One (1) through Forty-Nine (49) of Count III as paragraphs One (1) through Forty-Nine (49) of this Count IV.

**ANSWER**:  Defendant repeats and realleges its responses to each and every allegation contained in paragraphs 1 through 49, as though fully set forth herein.

50.     The transfers on Exhibits A and C were made by the Debtor to HCH within a four year period prior to the Debtor's bankruptcy filing.

**ANSWER**:  Defendant admits that two (2) transfers listed on Exhibit C were made by Debtor to Defendant within a four year period prior to the Debtor's bankruptcy filing.  Defendant denies that the lone transfer listed on Exhibit A was made by the Debtor to HCH within a four year period prior to the Debtor's bankruptcy filing.

51.     The Debtor did not receive reasonably equivalent value in exchange for the transfers identified on Exhibits A and C.

**ANSWER**: Defendant denies that the Debtor did not receive reasonably equivalent value in exchange for the transfers identified on Exhibit C. Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 51 and therefore denies them.

52. The Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction. In the alternative, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

**ANSWER**: Defendant lacks sufficient information to answer the allegations of paragraph 52 and therefore denies them.

53. Pursuant to 11 U.S.C. § 544(b), the Debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of Chapter 11 of the United States Code or that is not allowable only under section 502(e) of Chapter 11 of the United States Code.

**ANSWER**: Defendant states that 11 U.S.C. § 544(b) speaks for itself. To the extent that paragraph 53 alleges that Plaintiff may avoid or recover any transfers from Defendant, Defendant denies the allegations of paragraph 53.

54. The Debtor may avoid the transfers identified on Exhibits A and C pursuant to 11U.S.C. § 544(b) and the Illinois Fraudulent Transfer Act, 740 ILCS 160/5/(a)(2).

**ANSWER**: Defendant denies the allegations of paragraph 54.

## AFFIRMATIVE DEFENSES

### Affirmative Defenses Related to the Transfers
### Identified On Exhibits A & C to the Complaint

### First Affirmative Defense
(The Transfers on Exhibits A & C were not of Assets of the Debtor)

1. Upon information and belief, Player or Malone were officers, board members, or employees of the Debtor when the transfers listed on Exhibits A & C to the Complaint were made and, therefore, they were entitled to receive compensation or other remuneration from the Debtor.

2.     On information and belief, the transfers listed on Exhibits A & C to the Complaint were compensation for services rendered by Player or Malone.

3.     Player or Malone caused their compensation to be paid directly to Defendant.

4.     The transfers listed on Exhibits A & C to the Complaint were not assets of the Debtor, but rather were assets of Player or Malone.

5.     Accordingly, the transfers listed on Exhibits A & C to the Complaint were not "property of the debtor" nor were they "an interest of the debtor" as required to avoid a transfer pursuant to 11 U.S.C. §§ 548 and 544(b).

**Second Affirmative Defense**
(The Transfers on Exhibits A & C may not be Recovered Pursuant to 11 U.S.C. § 550)

6.     On information and belief, the transfers listed on Exhibits A & C to the Complaint constituted remuneration from the Debtor to Player or Malone.

7.     Accordingly, Player or Malone was the initial transferee of the transfers listed on Exhibits A & C to the Complaint and Defendant is the mediate transferee of those transfers.

8.     To the extent Defendant received the transfer listed on Exhibit A (which it denies), Defendant provided value to Player or Malone for the transfers listed on Exhibits A & C to the Complaint by, among other things, applying the transfers listed on Exhibits A & C to the Complaint in satisfaction of Player's or Malone's debts to Defendant.

9.     To the extent Defendant received the transfer listed on Exhibit A (which it denies), Defendant took the transfers listed on Exhibits A & C to the Complaint in good faith and without knowledge of their alleged voidability.

10.     Therefore, pursuant to 11 U.S.C. § 550(b), the transfers listed on Exhibits A & C to the Complaint may not be recovered from Defendant.

**Affirmative Defenses Related to the Transfers**
**Identified On Exhibit B to the Complaint**

**Third Affirmative Defense**
(The Transfers on Exhibit B may not be Recovered Pursuant to 11 U.S.C. § 550)

11.     The transfers listed on Exhibit B to the Complaint were not made with assets of the Debtor and were not property of the Debtor.

12.     With respect to the transfers listed on Exhibit B to the Complaint that Defendant actually received and cashed, Defendant took those transfers in good faith and without knowledge of their alleged voidability of such transfers.

13.     Therefore, pursuant to 11 U.S.C. § 550(b), the transfers listed on Exhibit B to the Complaint may not be recovered from Defendant.

**Affirmative Defenses Related to all Transfers**
**Identified On Exhibits A, B, & C of the Complaint**

**Fourth Affirmative Defense**
(The Transfers may not be Avoided Pursuant to 11 U.S.C. § 548(c))

14.     Defendant took the transfers in good faith and for reasonably equivalent value or value to the Debtor in exchange for the transfers.

15.     Accordingly, pursuant to 11 U.S.C. § 548(c), the transfers may not be avoided.

**Fifth Affirmative Defense**
(Disregard of Corporate Form)

16.     At or about the time of the transfers, the Debtor routinely disregarded its corporate form such that it was essentially operated as the alter ego of Player, Malone, and/or other directors, officers, employees or agents of the Debtor.

17.     As such, any reasonably equivalent value or value provided by Defendant for the transfers to the Debtor, Player, Malone, and/or other directors, officers, employees or agents of the Debtor, must be viewed as reasonably equivalent value or value provided to all such parties.

## Sixth Affirmative Defense
(Equitable Defenses)

18.     The causes of action asserted in the Complaint are barred under the doctrines of setoff, recoupment, unclean hands, laches, estoppel or *in pari delicto*.

## JURY DEMAND

1.      Defendant has not filed a proof of claim against the Debtor's bankruptcy estate and is therefore entitled to a jury trial.

Dated: March 16, 2012                    Respectfully submitted,


HORSESHOE HAMMOND, LLC

By: /s/ *Catherine Steege*
         One of its attorneys

Catherine Steege (06183529)
David H. Hixson (06289751)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL  60611-7603
PH: (312) 222-9350
FAX: (312) 527-0484