# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 09 B 39937 |
| EQUIPMENT ACQUISITION ) | |
| RESOURCES, INC. ) | |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |
| WILLIAM A. BRANDT, JR., not ) | |
| individually but solely in his capacity as Plan ) | |
| Administrator for EQUIPMENT ) | |
| ACQUISITION RESOURCES, INC., ) | Case No. 12-cv-00271 |
| ) | |
| Plaintiff, ) | Hon. Edmond E. Chang |
| ) | |
| v. ) | |
| ) | |
| HORSESHOE HAMMOND, LLC, a/k/a ) | |
| HORSESHOE CASINO HAMMOND, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Catherine Steege (06183529)
Melissa M. Hinds (06288246)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

# TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................................................1

**UNDISPUTED FACTS** .........................................................................................................3

    A.    Brandt's Complaint. ...............................................................................................3

    B.    Player's And Malone's Credit Applications. .........................................................4

    C.    Player's And Malone's Payments To Horseshoe Repaid Antecedent Debts. ................5

    D.    Horseshoe Had No Knowledge That EAR Made Fraudulent Transfers To Player And Malone And Acted In Good Faith. ......................................................5

    E.    Brandt's Inability To Trace All Of The Payments. ................................................6

**ARGUMENT** .........................................................................................................................6

    I.    Summary Judgment Standard. ...............................................................................6

    II.    Brandt Cannot Recover Under 11 U.S.C. §550(a)(2) And (b)(1). .........................7

    A.    Horseshoe Was An "Immediate or Mediate" Transferee. .....................................7

    B.    Horseshoe Provided Value For The Payments. ....................................................8

    C.    Horseshoe Took The Transfers In Good Faith And Without Knowledge Of The Voidability Of The Transfers From EAR To Player And Malone. ................8

        1.    The "Voidable" Transfers Are The Transfers From EAR. ......................9

        2.    Horseshoe Had No Knowledge Of The Voidability Of The Transfers From Player And Malone, And Thus Acted In Good Faith. .......................9

        3.    Even If Credited, Brandt's Claims That Horseshoe Failed To Comply With Its Own Procedures Or Applicable Law Do Not Negate Horseshoe's Good Faith. .................................................................13

    III.    Horseshoe Is Entitled To Summary Judgment On The $1,609,117.00 In Payments That Brandt Cannot Trace From EAR To Horseshoe. ..........................15

**CONCLUSION** ....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allard v. Hilton (In re Chomakos)*,
   170 B.R. 585, 595-96 (Bankr. E.D. Mich. 1993) ............................................................. 12, 13

*Allard v. Flamingo Hilton (In re Chomakos)*,
   69 F.3d 769 (6th Cir. 1995) ........................................................................................................ 8

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................................... 6

*Bonded Financial Services Inc. v. European American Bank*,
   838 F.2d 890, 892 (7th Cir. 1988) ............................................................ 1, 2, 9, 11, 12, 13, 14

*CLC Creditors' Grantor Trust v. Howard Savings Bank et al (In re Commercial Loan Corp.)*,
   396 B.R. 730 (Bankr. N.D. Ill. 2008) ..................................................................... 2, 9, 11, 12

*Covey v. Peoria Speakeasy, Inc. (In re Duckworth)*,
   Case No. 11-8092, 2013 WL 1397456, at *5 (Bankr. C.D. Ill. April 5, 2013) ....................... 8

*First Independence Capital Corp. v. Merrill Lynch Business Financial Servs. Inc. (In re First Independence Capital Corp.)*,
   181 Fed. App'x 524 (6th Cir. 2006) ........................................................................................ 14

*For Your Ease Only, Inc. v. Calgon Carbon Corp.*,
   560 F.3d 717 (7th Cir. 2009) ..................................................................................................... 9

*Omega Healthcare Investors, Inc. v. Res-Care, Inc.*,
   475 F.3d 853 (7th Cir. 2007) ..................................................................................................... 6

**STATUTES**

11 U.S.C. § 550 .............................................................................................................. passim

11 U.S.C. §§ 544 and 548 of the Bankruptcy Code ...................................................... 7, 9, 10, 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) .................................................................................................................... 6

Horseshoe Hammond, LLC ("Horseshoe") hereby submits its Memorandum of Law in support of its Motion for Summary Judgment (the "Motion").

## INTRODUCTION

On October 23, 2009, Equipment Acquisition Resources Inc. ("EAR") filed a chapter 11 bankruptcy petition. On July 15, 2010, the Bankruptcy Court confirmed a plan of liquidation that appointed William A. Brandt Jr. as EAR's Plan Administrator. On October 20, 2011, Brandt sued Horseshoe to recover $8,278,000.00 in payments (the "Payments") that non-debtors Sheldon Player and Donna Malone made to Horseshoe in payment of debts that Brandt concedes they owed to Horseshoe.

Brandt's theory is that every dollar EAR paid to Player and Malone was a fraudulent transfer and therefore he is entitled to recover from Player's and Malone's creditors, like Horseshoe, for the benefit of EAR's creditors. Although Brandt admits that Horseshoe did not know or even have any reason to know EAR was engaged in fraud, Brandt contends that Horseshoe should have somehow investigated EAR, a private company, and uncovered its fraud. Because it failed to do so, Brandt argues that Horseshoe is responsible to return the Payments even though Brandt also acknowledges that Horseshoe was legitimately owed the amounts Player and Malone paid to it. Brandt has yet to explain how Horseshoe, which had no access to EAR's financial records, could have uncovered the fraud when EAR's outside auditors and creditors (who had the right to review EAR's records) were unable to do so. Moreover, as Brandt's own experts have admitted, none of the reasons Brandt advances for why Horseshoe should have found Player's gaming activities "suspicious" would have led Horseshoe to suspect that EAR was making fraudulent transfers.

Brandt's claims are factually implausible and legally unsupportable. As the Seventh Circuit explained in its seminal decision, *Bonded Financial Services Inc. v. European American*

*Bank*, 838 F.2d 890, 892 (7th Cir. 1988), "[t]here have always been limits on the pursuit of [fraudulent transfers]." Once a bankruptcy trustee (or Plan Administrator like Brandt) seeks to recover an alleged fraudulent transfer from someone other than the direct beneficiary or recipient of the funds—in bankruptcy parlance, from a mediate transferee like Horseshoe—the trustee must prove not only the underlying fraudulent transfer case but also must trace the funds to the mediate transferee. 11 U.S.C. § 550(a)(2); *CLC Creditors' Grantor Trust v. Howard Savings Bank et al (In re Commercial Loan Corp.)*, 396 B.R. 730, 743 (Bankr. N.D. Ill. 2008). In addition, the Court must find that the mediate transferee did *not* provide value to the party that paid it and did *not* receive the funds in good faith and without knowledge that it was receiving fraudulently transferred funds. 11 U.S.C. §§ 550(a)(2), (b)(1).

Posing a hypothetical almost identical to this case, the Seventh Circuit explained that "[i]f the recipient of a fraudulent conveyance uses the money to buy a Rolls Royce, the auto dealer need not return the money to the bankrupt even if the trustee can identify the serial numbers on the bills. The misfortune of the firm's creditors is not a good reason to mulct the dealer, who gave value for the money and was in no position to monitor the debtor." *Bonded*, 838 F.2d at 892. Substitute Horseshoe for the Rolls Royce dealer and EAR for the debtor and the outcome is the same as in *Bonded*. It is undisputed that Horseshoe did, in fact, provide value to Player and Malone, and that Horseshoe acted in good faith and—as Brandt's expert witnesses concede—without knowledge, or reason to have knowledge, of the fraud Player allegedly was perpetrating at EAR. Accordingly, Brandt cannot recover from Horseshoe, and summary judgment should be entered in Horseshoe's favor on all Counts in the Complaint.

Partial summary judgment also is warranted for the additional reason that Brandt has admitted that of the $8,278,000.00 he claims in his Complaint, he cannot trace $1,609,117.00

2

from EAR to Player to Horseshoe and, therefore, Horseshoe is entitled to partial summary judgment dismissing these Payments from the case.[1]

## UNDISPUTED FACTS

### A. Brandt's Complaint.

Brandt's Complaint advances two distinct storylines, only one of which involves Horseshoe. *First*, the Complaint describes Player as the mastermind of an equipment leasing fraud at EAR. (Statement of Material Facts ("SMF") ¶11.) Brandt alleges from at least 2005 until October 8, 2009, Player caused EAR to engage in this fraud, and that this fraud remained undetected even by EAR's accountants, financial advisors, and largest creditors. (*Id.*) Brandt alleges that at the same time Player and his wife Malone collected nearly $17 million from EAR and that all of these transfers were fraudulent transfers. (*Id.*) *Second*, the Complaint alleges that Player and Malone, regular customers at Horseshoe, spent millions of dollars from their personal bank accounts patronizing Horseshoe. (*Id.¶*6.) And although the Complaint is replete with examples of why Brandt believes Player's gaming was unusual and erratic, it is critical to note that Brandt does *not* allege that Horseshoe had any knowledge whatsoever of the events that were taking place at EAR, and Brandt's experts testified that Player's gaming behavior would not have given Horseshoe reason to know about the alleged EAR fraud. (*Id.¶¶*61-62.) Brandt nonetheless contends that every dollar Player and Malone paid to Horseshoe should be returned to EAR.

---

[1] Although Horseshoe disputes that Brandt will be able to prove that EAR made fraudulent transfers to Player or Malone or to trace the balance of the Payments from EAR to Player/Malone to Horseshoe, it is not moving for summary judgment on those issues as they raise disputed fact issues. In addition, under 11 U.S.C. § 550(d), Brandt is only entitled to a single satisfaction and must prove that notwithstanding the property and funds that Player and Malone have already returned to EAR that he has not already recovered the funds he claims from Horseshoe.

B.     Player's And Malone's Credit Applications.

Horseshoe is a casino operating in Hammond, Indiana. (*Id.*¶1.) From at least 2007 through the Fall of 2009, Player and Malone (mostly Player) patronized Horseshoe. (*Id.*¶¶6;30.) In 2007, both Player and Malone applied for and received credit at Horseshoe. (*Id.*¶¶32;48.) Brandt's expert Nelson Rose testified that Horseshoe's internal policies for granting credit were appropriate. (*Id.*¶24.) Consistent with Indiana law, Horseshoe ran credit checks on Player and Malone. (*Id.*¶35;50.) These credit checks revealed that Player and Malone had high credit scores, many open and current lines of credit, and an established history of paying their debts to casinos. (*Id.*¶36-41;50.) In addition, Player and Malone both represented substantial assets on their credit applications. (*Id.*¶¶33;49.) Player's and Malone's credit applications identified EAR as their employer. (*Id.*) EAR was not Horseshoe's customer and Horseshoe had no access to EAR's financial records. (*Id.*¶56.) At all times while Player and Malone were customers of Horseshoe, an independent third party accounting firm audited EAR's financial statements, and those financial statements portrayed EAR as a healthy, profitable company. (*Id.*¶16.) Likewise, Player had personal financial statements that showed him to be a wealthy man with substantial assets. (*Id.*)

During this same time period, between 2007 and the fall of 2009, EAR's creditors included numerous sophisticated financial institutions, such as NorStates Bank, Harris Bank, and Republic Bank of Chicago. (*Id.*¶12.) These creditors, who dealt directly with EAR and had access to its financial records, continued to do so throughout this time period without uncovering EAR's fraud. (*Id.* ¶¶12;14;17.) EAR's outside accountants also certified EAR's financial statements without discovering the fraud. (*Id.* ¶16.) At a private meeting of 30-40 of EAR's creditors on September 24, 2009, FTI Consulting gave a presentation in which it stated that it had complete access to all EAR books and records; yet as of the date of that presentation, even FTI

was unaware of any fraudulent conduct. (*Id.*¶13-14.) Brandt acknowledged that the alleged EAR fraud was known as of the September 24, 2009 meeting. FTI did not discover the alleged fraud until September 29, 2009 and Brandt did not confirm it until October 12, 2009. (*Id.*¶¶18-20.) Player made his last payment to Horseshoe six weeks earlier on August 24, 2009. (*Id.*¶6.)

### C. Player's And Malone's Payments To Horseshoe Repaid Antecedent Debts.

Player and Malone typically gambled by taking out markers. (*Id.*¶6.) Player and Malone would repay their markers by checks drawn on their personal bank accounts. (*Id.*) Between February 12, 2007 and August 24, 2009, Player made 86 payments totaling $8,188,000.00 to Horseshoe from a Player or a Player/Malone joint account and Malone made 9 payments totaling $90,000.00 from her bank account. (*Id.*) In response to Horseshoe's Interrogatories, Brandt stated that he "does not contend that [Horseshoe] did not take the [Payments] for value . . . to the extent Defendant took the [Payments] for value that value was provided to Sheldon Player or Donna Malone . . ." (*Id.*¶54.)

### D. Horseshoe Had No Knowledge That EAR Made Fraudulent Transfers To Player And Malone And Acted In Good Faith.

Horseshoe had no knowledge that the funds Player and Malone used to make the Payments to Horseshoe were funds that EAR fraudulently transferred to them. (*Id.*¶58.) Both Rick Mazer and Janet Guerrero, Horseshoe's former General Manager and Director of Credit and Collections, respectively, testified that they had no such knowledge, and Brandt has not produced anything in discovery to suggest that they did. (*Id.*¶¶57-58.) Horseshoe also acted in good faith and in compliance with the law in all of its dealings with Player and Malone. (*Id.*¶65.) Brandt admitted in response to the Horseshoe's Interrogatories that he had no factual basis to claim that Horseshoe was aware that EAR made fraudulent transfers to Player and Malone. (*Id.* ¶57.)

Instead, Brandt contends that Horseshoe did not act in good faith because Player engaged in what Brandt terms "suspicious" gaming activities. Even assuming for the sake of the Motion that Player's gaming activities were "suspicious," Brandt's expert Rose testified that this alleged "suspicious" behavior would not have put Horseshoe on notice that a fraud was occurring at EAR. (*Id.* ¶62.) Rose also testified that Horseshoe was not acting in "bad faith" when it accepted the transfers. (*Id.*) Brandt's other expert Alex Seddio testified that Horseshoe had no reason to know of the fraud at EAR. (*Id.* ¶61.) Further, Brandt has not presented any evidence that if Horseshoe had inquired, it would have discovered EAR's fraudulent conduct or that it had made fraudulent transfers to Player and Malone. It is undisputed that EAR's auditors and creditors, who had access to EAR's financial records, did not discover the fraud until October, 2009, *after* Player and Malone had made the last of their payments to Horseshoe. (*Id.* ¶¶12;14;15;17.)

E.  **Brandt's Inability To Trace All Of The Payments.**

Brandt's third expert, Patrick O'Malley, testified about his efforts to trace the funds that EAR transferred to Player and Malone. (*Id.* ¶68.) Of the $8,248,000.00 Brandt seeks to recover from Horseshoe in Counts I and II, O'Malley testified that he was unable to directly or indirectly trace $1,579,117.00 to Horseshoe and that Brandt was not seeking to recover those Payments. (*Id.*) O'Malley also did not trace the $30,000 Brandt seeks to recover in Count III. (*Id.*)

**ARGUMENT**

I.  **Summary Judgment Standard.**

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 857 (7th Cir. 2007).

6

## II. Brandt Cannot Recover Under 11 U.S.C. §550(a)(2) And (b)(1).

The Bankruptcy Code contains separate requirements for the avoidance and recovery of fraudulent transfers. Sections 544 and 548 set forth the elements a trustee must prove to avoid a fraudulent transfer. 11 U.S.C. §§ 544, 548. But even if a transfer from a debtor is avoided, whether it is *recoverable* is a separate question that is answered by Section 550. Section 550 states in relevant part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553 (b), or 724 (a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.
>
> (b) The trustee may not recover under section (a)(2) of this section from—
>
> > (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided;

11 U.S.C. §§ 550(a), (b). Here, Section 550 provides Horseshoe with an absolute defense to its receipt of the Payments because—regardless of whether the underlying transfers from EAR were fraudulent—Horseshoe took the Payments from Player and Malone for value, in good faith, and without knowledge of the voidability of the transfers it received.

### A. Horseshoe Was An "Immediate or Mediate" Transferee.

It is undisputed that Player and Malone made the $8,248,000.00 in Payments identified on Exhibit A to Plaintiff's Complaint from their own personal bank accounts and EAR did not transfer a single penny of the Payments directly to Horseshoe. (SMF¶6.) With regard to the $30,000.00 in Payments identified on Exhibit B to Plaintiff's Complaint, it is undisputed that those funds were not withdrawn from an active EAR operating account, but rather an old EAR

7

account that Malone had used as a personal account for several years. (*Id.*¶10.) Thus, under 11 U.S.C. § 550(a)(2), Horseshoe is a mediate transferee, "i.e., one who received a transfer from someone other than the debtor." *Covey v. Peoria Speakeasy, Inc. (In re Duckworth)*, Case No. 11-8092, 2013 WL 1397456, at *5 (Bankr. C.D. Ill. April 5, 2013) (attached hereto).

### B.  Horseshoe Provided Value For The Payments.

It is equally without dispute that Horseshoe provided Player and Malone opportunities to gamble and when Player and Malone repaid Horseshoe, they were satisfying an existing antecedent debt. (SMF¶22.) Section 550(b)(1) specifies that a transferee provides value when it takes a payment, like Horseshoe did here, in satisfaction of an antecedent debt. Moreover, the case law holds that a casino provides value when it allows a customer to gamble as Horseshoe did here. *See, e.g., Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir. 1995). In *Chomakos*, the Sixth Circuit affirmed a lower court's finding that individual debtors received reasonably equivalent value in exchange for the bet they placed at the casino, explaining:

> Where gambling is lawful, as it was in the case at bar, the placing of a bet gives rise to legally enforceable contract rights. These contract rights constitute 'property,' of course, and at the time which Collier identifies as 'critical'—a time before anyone can know whether the bet will be successful—the property has economic value.

*Id.* at 770-71. Brandt has admitted in discovery that Horseshoe provided Player and Malone with value. (SMF¶54.) Brandt has not produced any evidence (nor could he) that Horseshoe did not give value when it permitted Player and Malone to engage in gaming activities. Accordingly, Horseshoe provided value for the Payments.

### C.  Horseshoe Took The Transfers In Good Faith And Without Knowledge Of The Voidability Of The Transfers From EAR To Player And Malone.

Because Horseshoe is a mediate transferee and provided value to Player and Malone, the crux of Brandt's case to recover from Horseshoe depends on the second two elements of Section

550(b)(1): good faith and knowledge of the voidability of transfers received. The Seventh Circuit "defined good faith for purposes of §550(b) of the bankruptcy code as a state of mind in which the person is 'without knowledge of voidability.'" *For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009) (quoting *Bonded*, 838 F. 2d at 897). Thus, although "good faith" and lack of "knowledge of the voidability of transfers received" are separate elements of a Section 550(b)(1) defense, they are best considered together, as "both appear to hinge on knowledge—what the transferee knew about the transfer." *CLC Creditors' Grantor Trust*, 396 B.R. at 745.

### 1. The "Voidable" Transfers Are The Transfers From EAR.

As a preliminary matter, when this Court considers whether Horseshoe had "knowledge of the voidability of transfers received," the transfers at issue are the transfers from EAR to Player and Malone, *not* the transfers from Player and Malone to Horseshoe. Sections 548 and 544 permit a trustee to avoid a transfer "of an interest of the *debtor* in property" 11 U.S.C. §§ 544, 548 (emphasis supplied). Thus, the voidable transfers are those from the debtor, EAR, and the critical question for this Court is whether there is a genuine fact issue as to whether Horseshoe knew, or should have known, that EAR had made fraudulent transfers to Player and Malone. As shown below, there is not; consequently Horseshoe is entitled to summary judgment.

### 2. Horseshoe Had No Knowledge Of The Voidability Of The Transfers From Player And Malone, And Thus Acted In Good Faith.

It is undisputed that Horseshoe had no knowledge of the alleged fraud at EAR (and hence the voidable transfers EAR was making to Player and Malone) at the time Player and Malone made the Payments to Horseshoe. (SMF ¶¶57-58.) Brandt has not alleged that Horseshoe had actual knowledge of the EAR fraud—indeed, in his interrogatory responses, Brandt admitted that he had no factual basis to contend that Horseshoe had actual knowledge of the EAR fraud. (*Id.*

9

¶57.) Each of Brandt's experts testified that the so-called "red-flags" they identified would not have alerted Horseshoe to the fraud occurring at EAR. (SMF ¶¶61-62.) Professor Rose testified:

> Q: It's not your opinion, is it, that any of [the red flags in your report] 1 through 16 should have put the casino on notice that Equipment Acquisition Resources was engaging in a leasing fraud or fraudulent activity?
>
> A: That's correct.

(*Id*. ¶62.) Similarly, Seddio testified:

> Q: Okay. Is it your contention Horseshoe should have known from any of the red flags or suspicious activity that's in your report [or] that was part of your deposition testimony that there was a fraud going on at EAR?
>
> A: I don't think they necessarily would have known that, but they—once they sensed that he was involved in walking with chips and converting chips to currency and removing the currency from the casino, and they conducted additional due diligence, they most likely would have found that he had a prior conviction for fraud, and that in itself should have set alarm bells off.
>
> Q: Would the fact that [Player] had a prior conviction for fraud in your opinion, should that fact put Horseshoe on notice that with regard to the current company, Equipment Acquisition Resources, that there was a fraud going on there?
>
> A: Put them on notice that they're dealing with a convicted felon.
>
> Q: Would it have put them on notice that there was a fraud going on at EAR?
>
> A: *No*, but there's—if you couple that fact with the fact that he was involved in suspicious activity and was removing cash, and apparently attempting to launder, you know, funds that were in the form of monetary instruments into cash, I think that should have been decisive in terms of their decision.
>
> Q: The decision to allow him to continue to patronize Horseshoe Casino.
>
> A: Yeah, I think so.

(*Id.* ¶61 (emphasis supplied).) Thus, while both Rose and Seddio opine that Player's gaming activity at Horseshoe was allegedly "suspicious," neither are of the opinion that this suspicious activity would have been sufficient to give Horseshoe notice that EAR had made fraudulent transfers to Player and Malone. Finally, Mazer and Guererro have testified that they had no

knowledge that EAR was engaged in a fraud or making fraudulent transfers to Player and Malone. (*Id.*¶58.)

In an analogous case, the Seventh Circuit affirmed a summary judgment order holding that the trustee could not recover under Section 550. *Bonded*, 838 F.2d at 898. In *Bonded*, the trustee argued that a bank, which received a check from an individual and applied it to that individual's outstanding indebtedness, should have known that the individual's business, Bonded, was in distress, and that the payment was suspect. 838 F.2d at 897. The trustee argued that had the bank investigated the check payment, it would have learned that the individual was fraudulently taking funds from Bonded to pay his own debts. *Id.* The Seventh Circuit rejected this argument and affirmed the lower court's determination that bank took for value and without knowledge of the voidability of the initial transaction. *Id.* 898. In so doing, the Court explained: "'[k]nowledge is a stronger term than 'notice' . . . A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own." *Id.* A recipient of funds from the initial beneficiary of a fraudulent transfer does not have a "duty to investigate, to be a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain." *Id*.

Applying the Seventh Circuit's analysis in *Bonded*, in *CLC Creditors' Grantor Trust*, a bankruptcy court applied an "inquiry notice" standard to the question of whether the defendants took in good faith and without knowledge of the voidability of the transfers. The court granted summary judgment in favor of two of the mediate transferees because the record evidence demonstrated that the mediate transferees had no knowledge that the funds they received were fraudulently transferred. 396 B.R. at 745.

Like the trustee in *Bonded*, Brandt appears to suggest that Horseshoe lacked good faith because it should have investigated EAR. The Seventh Circuit rejected this argument in *Bonded*, and this Court should follow suit. 838 F.2d at 898. Even putting aside the fact that Brandt's own experts disagree with his position, the undisputed record simply does not support it. *First*, the record shows that sophisticated banks interacting directly with EAR were unaware of the fraud that was occurring. (SMF ¶12;17.) Even the forensic accounting firm of FTI—charged with the responsibility to review EAR's financial records—was in the dark for many months about the fraud. (*Id.*¶14.) The record also includes audited corporate and personal financial statements that represent EAR as a healthy company and Player and Malone as wealthy individuals. (*Id.*¶16.) *Second*, Horseshoe was under no duty to conduct such investigations. Applicable law requires Horseshoe to report suspicious activity of its customer and currency exchanges over a certain amount. 31 C.F.R. 103.21. That is it. Horseshoe's duty to report is not the same as a duty to conduct a full independent investigation to discover facts about the employer of its customers unknown even to that employer's (EAR's) most sophisticated creditors.

Moreover there is no causal connection between Horseshoe's reporting obligations and using fraudulently conveyed property to pay one's debts. In *Bonded* and *CLC Creditors Trust*, the courts examined whether the facts alleged to impose a duty of inquiry and knowledge put the mediate transferee on notice that it received fraudulently transferred funds. Here, Brandt relies upon gaming conduct that has nothing to do with EAR and its alleged fraudulent activities and thus, did not give Horseshoe the knowledge that would allow recovery under Section 550. Considering similar facts, a bankruptcy court rejected Brandt's position that casinos are the "protector[s] of the creditors of its customers...." *Allard v. Hilton (In re Chomakos)*, 170 B.R. 585, 595-96 (Bankr. E.D. Mich. 1993). As Brandt argues here, in that case, the trustee argued

12

that "to protect themselves [casinos] must continuously inquire and be sufficiently knowledgeable as to the financial circumstances of each of its patrons so that they can, in light of the knowledge thus obtained, refuse access to certain of those patrons." *Id.* The court held that this was not the law and "would tip the scales inordinately in favor of creditors and do excessive harm to society's interest in maintaining the integrity of legal and commercial transactions." *Id*.

Thus, it is incredible for Brandt to argue that Horseshoe, a casino with no direct connection to EAR, had knowledge of or even could have uncovered the fraud at EAR. As the Seventh Circuit concluded in *Bonded*, Horseshoe which was far removed from EAR "was in no position to monitor" EAR and uncover its alleged fraud when its own auditors and sophisticated creditors who had access to its books and records were unable to do so. 838 F.2d at 892. Having given value to Player and Malone, Horseshoe is legally entitled to keep the Payments it received and the Trustee should look to Player and Malone for his recovery, if he is entitled to one.

### 3. Even If Credited, Brandt's Claims That Horseshoe Failed To Comply With Its Own Procedures Or Applicable Law Do Not Negate Horseshoe's Good Faith.

This Court should likewise reject any argument that the Payments were not made in good faith. Brandt's case that they were not appears to center around his claim that Horseshoe supposedly failed to comply with its internal policies and applicable laws.[2] It is undisputed, however, that Horseshoe was never sanctioned or penalized in any way by any state, federal, or other body for its conduct in connection with Player and Malone. (SMF ¶65.) Through his experts, Brandt seeks to establish that—despite the lack of any record evidence that Horseshoe failed to comply with the law—Horseshoe's conduct in dealing with Player and Malone

---

[2] In response to Horseshoe's interrogatory asking whether Brandt planned to argue that "Defendant failed to comply with any applicable law or regulation, whether federal, state or otherwise, by accepting the [Payments]?", Brandt answered that he was proceeding only upon the legal theories in his Complaint. (SMF ¶59.) Because Brandt's Complaint does not allege that Horseshoe violated Indiana State law or the Bank Secrecy Act, Brandt should not be allowed to argue this point here.

indicated that Horseshoe was not acting in good faith. But his expert Rose testified that Horseshoe did not act in bad faith in accepting Payments from Horseshoe. (*Id.¶*62.)

Moreover, the thrust of these two opinions was that Horseshoe did not always comply with its internal procedures and allegedly underreported Player's transactions and so-called suspicious activity. But even assuming that Brandt's experts are correct in their opinions (and they are not), it still does not follow that the Payments are recoverable. As the Seventh Circuit explained in *Bonded*: "Since the inquiry would have turned up nothing pertinent to voidability, the Bank's failure to make it does not permit a court to attribute to it the necessary knowledge [under Section 550(b)]." 838 F.2d at 898. Here, as in *Bonded*, a further inquiry into Player and Malone would have "turned up nothing pertinent to voidability." Had Horseshoe requested more information regarding their personal finances or those of EAR, Player and Malone would have produced audited personal financial statements demonstrating their wealth and EAR's profitability. (SMF¶16.) Even creditors with access to the records of EAR were unaware of the alleged fraud until well after Player and Malone had made the last of the Payments to Horseshoe. (*Id.¶¶*12;17.) Put simply, there is nothing that Horseshoe even arguably was required to do that, had it done it, would have led to Horseshoe to discover EAR's alleged fraud.

*First Independence Capital Corp. v. Merrill Lynch Business Financial Servs. Inc. (In re First Independence Capital Corp.)*, 181 Fed. App'x 524 (6th Cir. 2006) (attached hereto) is instructive. The defendant in *First Independence*, Merrill Lynch, maintained a brokerage account for the owners of First Independence. First Independence made a series of fraudulent transfers to its owners, which the owners then transferred to their brokerage account at Merrill Lynch. *Id.* Similar to Brandt's allegations that Horseshoe failed to comply with its internal policies, the plaintiff in *First Independence* argued at trial that the Merrill Lynch accepted checks from the

owners in violation of Merrill Lynch's internal policy. Nevertheless, the trial court concluded that Section 550 provided Merrill Lynch with an absolute defense. The Sixth Circuit affirmed, explaining that the fact that Merrill Lynch violated its own policies "neither prove[d] that Merrill Lynch possessed actual knowledge of the transfers' voidability nor show[ed] that it acted with anything other than proper intentions." *Id.* at * 3. Similarly, here, Brandt admits that Horseshoe had no knowledge of the fraud taking place at EAR. And Horseshoe's alleged failure to comply with its own policies and applicable laws and regulations—even if corrected—would not have given Horseshoe knowledge of the EAR fraud. Thus, Brandt cannot recover under Section 550.

### III. Horseshoe Is Entitled To Summary Judgment On The $1,609,117.00 In Payments That Brandt Cannot Trace From EAR To Horseshoe.

Section 550(a)(1) provides that "to the extent a transfer is avoided," a trustee may recover "the property transferred." 11 U.S.C. §550(a). Thus, by its plain terms, Section 550 requires a trustee to trace the property that was fraudulently transferred into the hands of a mediate transferee. Brandt cannot do that here. His tracing expert O'Malley testified that he cannot trace $1,579,117.00 of the Payments from EAR through Player and Malone to Horseshoe, and failed to perform a tracing analysis for the $30,000.00 Brandt seeks to recover in Count III. (SMF ¶68.) Horseshoe is entitled to partial summary judgment eliminating these Payments from the case.

### CONCLUSION

Horseshoe requests that the Court enter summary judgment in its favor and dismiss Brandt's complaint with prejudice and with costs. Alternatively, Horseshoe requests entry of partial summary judgment on the untraced Payments and undisputed elements of Section 550.

Dated: August 23, 2013                   Respectfully submitted,

                                         HORSESHOE HAMMOND, LLC

                                         By: /s/ *Catherine Steege*
                                           One of its attorneys

15