|                                        |     |                           |
| -------------------------------------- | --- | ------------------------- |
| IN RE EQUIPMENT ACQUISITION RESOURCES, INC., | )   |                           |
|                                        | )   |                           |
|                                        | )   |                           |
| Debtor.                                | )   |                           |
|                                        | )   |                           |
|                                        | )   |                           |
| WILLIAM A. BRANDT, JR., solely as      | )   | No. 12 C 00271            |
| Administrator for EQUIPMENT            | )   |                           |
| ACQUISITION RESOURCES, INC.,           | )   | Judge Edmond E. Chang     |
|                                        | )   |                           |
| Plaintiff,                             | )   |                           |
|                                        | )   |                           |
| v.                                     | )   |                           |
|                                        | )   |                           |
| HORSESHOE HAMMOND, LLC, a/k/a/         | )   |                           |
| HORSESHOE CASINO HAMMOND,              | )   |                           |
|                                        | )   |                           |
| Defendant.                             | )   |                           |

## MEMORANDUM OPINION AND ORDER

Equipment Acquisition Resources, Inc. (EAR) filed a chapter 11 bankruptcy petition in October 2009. The bankruptcy court confirmed a liquidation plan that appointed William A. Brandt, Jr. as EAR's Plan Administrator. Brandt then brought a fraudulent-transfer action against Defendant Horseshoe Casino to recover $8,278,000 million in payments that EAR's owner, Sheldon Player, and his wife, Donna Malone, made to Horseshoe to pay off their gambling debts.[1] R. 79,

---

[1] The Court has subject matter jurisdiction over this case based on 28 U.S.C. §§ 157(d) and 1334(b). Earlier in this lawsuit, this Court granted Horseshoe's motion to withdraw reference to the adversary proceeding that Brandt initiated against Horseshoe in the bankruptcy court. R. 8, 2/13/12 Minute Entry.

Citations to the docket are "R." followed by the entry number and, when necessary, the page/paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact

Second Am. Compl. ¶¶ 51, 56, 60. Horseshoe has filed a summary-judgment motion. R. 96. For the reasons discussed below, the Court grants Horseshoe's motion.

## I. Background

In deciding Horseshoe's motion for summary judgment, the Court views the evidence in the light most favorable to Brandt, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Sheldon Player and his wife, Donna Malone, established EAR as a "doing business as" entity in 1997. Pl.'s Resp. DSOF ¶ 9. EAR refurbished special machinery, manufactured high-end technology parts, and developed processes used to manufacture "high-technology." *Id.* Initially, Player and Malone ran the company out of the basement in their home. *Id.* ¶ 10. When they established the company, Malone opened a checking account (as explained later, this account plays a role in the motion) at Buffalo Grove Bank in the name of "Donna Malone doing business as EAR." *Id.* The account was later transferred to Charter One Bank. *Id.* But after EAR incorporated, it moved its business operations out of Player and Malone's home and opened business bank accounts in its own name. *Id.* Starting around 2005, EAR no longer used the Charter One account for business purposes. *Id.* Instead, Malone continued to use the Charter One account as her personal account, and she was the only authorized signor on the account. *Id.*

---

are "DSOF" (for Horseshoe's Statement of Facts) [R. 99]; "PSOF" (for Brandt's Statement of Facts) [R. 113]; "Pl.'s Resp. DSOF" (for Brandt's Response to Horseshoe's Statement of Facts) [R. 114]; and "Def.'s Resp. PSOF" (for Horseshoe's Response to Brandt's Statement of Facts) [R. 123], followed by the paragraph number.

From at least 2005 until October 2009, EAR engaged in a fraudulent leasing scheme of selling equipment at inflated prices and then leasing the equipment back from various lenders. *Id.* ¶ 11. During this time period, Player and Malone collected nearly $17 million in fraudulent transfers from EAR.[2] *Id.* Initially, none of EAR's creditors, financial advisors, or senior secured lenders detected this fraud scheme. *See id.* ¶¶ 12, 14, 17. Before EAR filed its Chapter 11 petition, Brandt attended a private meeting of over thirty of EAR's creditors on September 24, 2009. *Id.* ¶ 13. At that meeting, FTI Consulting, a company that EAR had retained in July 2009 to review its books and records, reported that it had not discovered any indications of fraud at EAR. *See id.* ¶ 14. It was not until September 29, 2009, five days later, that FTI approached Brandt and advised him that FTI had uncovered evidence of fraud at EAR. *Id.* ¶ 18. Brandt confirmed that EAR was engaged in this fraudulent scheme in October 2009, and EAR filed a Chapter 11 bankruptcy petition that same month. *Id.* ¶¶ 2, 20.

While the fraud scheme was ongoing at EAR, Player and Malone were regular customers at the Horseshoe Hammond casino in Hammond, Indiana. *See id.* ¶¶ 1, 6, 30, 55. Between October 2007 and October 2009, Player and Malone made $8,248,000 in payments to Horseshoe from their personal bank accounts—the amount Brandt seeks to recover in Counts I and II of his complaint. PSOF ¶ 1; Pl.'s

_____

[2]For purposes of its summary-judgment motion only, Horseshoe has assumed that these allegations are true. In its briefing, Horseshoe notes that its position is that Brandt would not be able to prove at trial that EAR made fraudulent transfers to Player or Malone, or to trace the balance of payments from EAR to Player and Malone and then to Horseshoe. Horseshoe nevertheless acknowledges that there are genuine fact questions related to these issues and is therefore not moving for summary judgment on these issues. *See* R. 98, Def.'s Br. at 3 n.1; *see also* DSOF at 5 n.1.

Resp. DSOF ¶ 52. And from October 2005 to October 2007, Malone made two payments to Horseshoe from the Charter One account totaling $30,000—the amount Brandt seeks to recover in Count III. PSOF ¶¶ 1, 27. Player and Malone made all of these payments to pay off their gambling debts at the casino. *See* Pl.'s Resp. DSOF ¶ 53.

In 2007, when they first started gambling at Horseshoe, both Player and Malone applied for credit at the casino. *Id.* ¶¶ 32, 48. On their applications, Player and Malone represented that they had substantial assets. *Id.* ¶¶ 33, 49. Player disclosed that he still owed $490,000 on a mortgage, and Malone represented that she had $400,000 of debt arising from credit cards and a mortgage. *Id.* Both Player and Malone listed EAR as their employer. *Id.* In addition to reviewing their credit applications, Horseshoe ran credit checks on both Player and Malone. *Id.* ¶¶ 35, 50. These credit checks revealed that Player and Malone had no past-due accounts, many open and current lines of credit, and an established history of paying their debts to casinos. *Id.* ¶¶ 36, 38, 50. But the credit checks also revealed that Player and Malone's credit applications understated their real estate debt by over $2 million. PSOF ¶ 2; *see also* R. 115-2, Pl.'s Exh. 2C at HCH-00976, HCH-00987; Pl.'s Exh. 2D at HCH-00652; Pl.'s Exh. 2E at HCH-00706. Horseshoe nevertheless still extended credit to Player and Malone. *See* PSOF ¶¶ 2-3.

Initially, Player requested and received $25,000 in credit from Horseshoe. Pl.'s Resp. DSOF ¶ 42. But over time, Horseshoe increased Player's credit line to $450,000. PSOF ¶ 10. After this increase, the amount of credit that Horseshoe had

extended to Player exceeded the average balance of the personal checking account that Player had on file with the casino. *Id.* ¶ 11; Def.'s Resp. PSOF ¶ 11.

The payments that Player and Malone made to Horseshoe were primarily to pay off "markers" that they took out to gamble. Pl.'s Resp. DSOF ¶ 6. Markers are advances, in the form of chips, against a customer's line of credit. PSOF ¶ 4. When a customer wants to obtain chips, he can sign a "marker," which is a check drawn against the account that the casino has on file for that customer; the casino then agrees not to deposit the "marker" check for a set period of time. *Id.* ¶ 5. Even though customers do not have to pay back the markers immediately, Horseshoe nevertheless encourages customers to pay off their markers (as much as possible) at the end of each gambling day. *Id.* ¶¶ 6-7. For example, if a customer obtains $10,000 in chips with a marker and then loses $6,000 gambling, the customer could take the remaining $4,000 in chips to the cashier to pay down the marker by that $4,000. *Id.* ¶ 8. The customer then has the set period of time to pay off the remaining $6,000 balance on the marker. *Id.* ¶ 9. In this case, Player was occasionally late paying back his markers, and in March, April, and May 2009, Horseshoe suspended his credit line until he became current. *Id.* ¶ 34.

According to one of Brandt's experts, from 2007 to 2009, Player purchased $9,775,500 in chips, won $1,413,414, lost $3,237,500, and redeemed $1,700,400 in chips. *Id.* ¶ 23. Given these records, the expert believes that Player lost more than he won and accumulated a "hoard" of chips worth $6,251,300 that he paid for by check. *See* R. 116-3, Pl.'s Exh. 23, Seddio Report at 8-9; *see also* R. 112, Pl.'s Resp.

Br. at 5, 13-14 (arguing that these chips "disappeared" or "vanished"). The expert opines that Horseshoe should have recognized Player's behavior as an attempt to launder money through the casino. *See* Seddio Report at 9.

Brandt also claims that Player's gambling activity raised "red flags" about the source of his funds. *See* R. 116-11, Pl.'s Exh. 31, Rose Report at 13-15 (listing sixteen "red flags"). For one, Player's primary residence was in Wyoming, yet he spent hundreds of hours a year gambling at Horseshoe, which is in Indiana: around 572 hours in 2007, 873 hours in 2008, and 720 hours in 2009. PSOF ¶ 12. Player also "walked with chips": he would leave the casino with his chips, without exchanging them for cash or to pay down markers. *Id.* ¶¶ 13, 18. Horseshoe discourages this practice and temporarily suspended Player's credit line when it caught him engaging in this practice. *Id.* ¶¶ 13, 15-16. Player was also known for "passing chips," or giving chips to other customers. *Id.* ¶ 22;[3] Pl.'s Resp. DSOF ¶ 63. This activity is suspicious in certain circumstances; for example, it could be a sign that customers are trying to structure their transactions with the casino so that they fall below the $10,000 threshold for completing a currency transaction report

---

[3]Although Horseshoe raises a hearsay objection to the deposition that Brandt cites in support of this fact, the deposition testimony would be admissible as a party admission because it is testimony from a Horseshoe employee. *See* Def.'s Resp. PSOF ¶ 22; *see also* R. 116-2, Pl.'s Exh. 22, Lebron Dep. at 46-47. But as Horseshoe also points out, there may be insufficient foundation for this testimony to establish that Player's "passing chips" was a "red flag" because, at least based on the excerpted testimony that is available in the summary-judgment record, the Horseshoe employee does not provide a timeframe for when the employee learned about Player potentially passing chips or how often it occurred. *See* Lebron Dep. at 46-47 (only noting that "multiple" employees told Lebron that Player was passing chips). Nevertheless, even assuming that Player's passing chips was a red flag that should have prompted Horseshoe to investigate, it does not change the Court's analysis, as explained more fully below.

(CTR). PSOF ¶ 21; Def.'s Resp. PSOF ¶ 21. Brandt argues that all of these "red flags" should have prompted Horseshoe to investigate both its own records and the source of Player and Malone's funds. Pl.'s Resp. Br. at 8. Had it investigated, Brandt believes that Horseshoe would have discovered evidence of EAR's fraud. *Id.*

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary-judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only competent evidence of a type otherwise admissible at trial, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

Horseshoe argues that it is entitled to summary judgment on all counts. In Counts I and II, Brandt seeks to recover $8,248,000 in payments that Player and Malone made to Horseshoe. In Count III, Brandt seeks to recover two payments totaling $30,000 that Malone made to Horseshoe from the Charter One account. For all of these counts, Horseshoe argues that it received the payments in good faith and without knowledge of EAR's fraud and is therefore shielded from liability under 11 U.S.C. § 550(b)(1).[4] The Court considers the first two counts together, and then Count III afterwards.

### A. Counts I and II

The Bankruptcy Code has separate requirements for avoiding a fraudulent transfer and for recovering the money or property that was fraudulently transferred. Sections 544 and 548 lay out the elements a trustee (or plan administrator) must prove to avoid a fraudulent transfer from a debtor. *See* 11 U.S.C. §§ 544, 548. Whether an avoided transfer can then be recovered is a separate question that is answered by § 550:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section [544 or 548] of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

---

[4]Brandt admits that his tracing expert was unable to trace $1,609,117 of the transfers Horseshoe received from Player and Malone back to EAR. *See* Pl.'s Resp. DSOF ¶ 68. Therefore, were the Court not granting summary judgment on all counts, the Court would grant partial summary judgment on this amount.

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a), (b).

Here, the only issue presented in Horseshoe's summary-judgment motion is whether it qualifies for § 550(b)(1)'s good-faith defense. *See* Def.'s Br. at 3 n.1; *see also* DSOF at 3 n.1. Because § 550(b)(1) provides an affirmative defense, Horseshoe has the burden of proving that the defense applies. *In re Smith*, 501 B.R. 843, 848 (Bankr. N.D. Ill. 2013). To avoid liability, Horseshoe must therefore prove that (1) it was an immediate or mediate transferee under § 550(a)(2), (2) it took the transfers from Player and Malone for value, (3) it took the transfers in good faith, and (4) it did not have "knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). Brandt and Horseshoe agree that Horseshoe can satisfy the first two of these requirements, *see* Def.'s Br. at 8; Pl.'s Resp. Br. at 7, but disagree as to the final two.

As a preliminary matter, the parties disagree about which transfers are relevant for determining whether Horseshoe had "knowledge of the voidability of *the transfer[s]* avoided." 11 U.S.C. § 550(b)(1) (emphasis added). Brandt argues that "the transfers" are the transfers from Player and Malone to Horseshoe, *not* the transfers from EAR to Player and Malone. Pl.'s Resp. Br. at 9-10. In support of his

argument, Brandt points to § 548, which permits trustees to avoid "*any* transfer . . . of an interest of the debtor in property." *Id.* at 9 (emphasis added) (quoting 11 U.S.C. § 548(a)(1)). According to Brandt, because EAR (the debtor) had an interest in the money that Player and Malone transferred to Horseshoe, the question should be whether Horseshoe knew or should have known that the funds transferred *to Horseshoe* could be voidable. *Id.* at 10. But this is not a reasonable interpretation of the statute. In fact, Brandt takes this short phrase from the statute—"*any* transfer"—out of context. The rest of § 548(a), for example, makes clear that it is the *debtor* who makes the voidable transfer, not some later transferee. *See, e.g.*, 11 U.S.C. § 548(a)(1)(A) (noting that the transfer may be avoided "if the *debtor* voluntarily or involuntarily *made such transfer* . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted" (emphasis added)). It is also reasonable to interpret "*the* transfer avoided" referenced in § 550(b)(1) as the transfer from the debtor to the initial transferee referenced in § 550(a), that is, those transfers avoided, for example, under § 548. 11 U.S.C. § 550(a), (b)(1) (emphasis added)). In short, "the transfer avoided" in § 550(b)(1) refers to the transfers that the debtor EAR made to Player and Malone. Therefore, the Court must analyze what Horseshoe knew or should have known about EAR's fraud. *Cf. Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 898 (7th Cir. 1988) (explaining that the inquiry should focus on whether the subsequent transferee knew of the debtor's "financial peril" or the plan to use the debtor-company in a fraud scheme).

Next, Brandt and Horseshoe disagree about whether the last two elements of the defense—good faith and without knowledge of voidability—should be considered together or separately. Horseshoe believes that they are best considered together, Def.'s Br. at 9, but Brandt believes that even though both elements "hinge on knowledge," they are discrete requirements that should be considered separately, Pl.'s Resp. Br. at 9. The Seventh Circuit has declined to decide whether there is a difference between these two elements. *See Bonded*, 838 F.2d at 897. *But see For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009) (appearing to collapse the two elements by explaining in dictum that "good faith" for purposes of § 550(b) means "a state of mind in which the person is 'without knowledge of voidability'" (quoting *Bonded*, 838 F.2d at 897)). This Court also need not decide whether it should consider these elements together or separately. As explained in detail later in this opinion, even if Horseshoe had a duty to investigate, an investigation would have turned up nothing.

Finally, Brandt and Horseshoe also dispute whether Horseshoe has ultimately satisfied the "good faith" and "without knowledge" requirements. The Seventh Circuit discussed these two elements in detail in *Bonded*, establishing an inquiry-notice standard. *See* 838 F.2d at 896-98. In that case, a bank received a loan payment from an individual and applied it to that individual's outstanding loan balance. *Id.* at 891. Earlier, the individual's business, Bonded, had written a check to the individual for the same amount as the individual's loan payment, and the individual had deposited this check into his personal account before paying the

bank a few days later. *See id.* Because of this chain of events, the trustee argued that the bank should have known Bonded was in financial distress and that the individual's payment was therefore suspect. *Id.* at 897. According to the trustee, had the bank investigated the payment, it would have learned that the individual was fraudulently taking funds from Bonded to pay his own debts. *Id.*

The Seventh Circuit rejected this argument. *Id.* at 898. First, the Seventh Circuit recognized that "the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate." *Id.* at 897-98. It further explained that "'[k]nowledge' is a stronger term than 'notice,'" and it emphasized that "[a] transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own." *Id.* at 898. In other words, a subsequent transferee does not have "a duty to investigate, to be a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain." *Id.* Ultimately, in *Bonded*, the Seventh Circuit affirmed that there was no evidence that should have prompted the bank to investigate the source of the individual's loan payments. *See id.* The individual had millions in assets and was current on his loan payments. *Id.* What's more, the Seventh Circuit emphasized that even if the bank had done an investigation, it would have learned that the transfer from Bonded to the individual was authorized by the appropriate corporate officials. *Id.* In short, an investigation would have turned up nothing. Therefore, the trustee

could not attribute knowledge of voidability to the bank, and the good-faith defense applied. *Id.*

Applying that holding here, Brandt concedes that Horseshoe had no *actual* knowledge about the fraud at EAR or about the fraudulent transfers that EAR made to Player and Malone. *See* Pl.'s Resp. DSOF ¶ 57. Brandt nevertheless argues that there were several "red flags" that should have prompted Horseshoe to investigate the source of Player and Malone's money. *See* Pl.'s Resp. Br. at 12-13. In terms of their credit history at the casino, Brandt emphasizes that (1) Player and Malone's March 2007 credit applications understated their debt, (2) Horseshoe extended credit to Player beyond the assets in his reported checking account, and (3) Horseshoe suspended Player's credit line on several occasions when he was late paying off his markers. *Id.* at 12. Brandt also notes that Horseshoe accepted two checks from Malone from the Charter One bank account.[5] *Id.*; *see also* PSOF ¶ 27. Next, Brandt also argues that Player's gambling activity was questionable. *See* Pl.'s Resp. Br. at 12-13. In particular, Brandt notes that Player spent an extraordinary amount of time gambling at Horseshoe, walked with chips at Horseshoe and other casinos, and passed chips to multiple agents. *Id.* Given Player's suspicious activity

---

[5]In a background section of his brief, Brandt flags a $167,000 cashier's check from EAR (for which Player was the remitter) to Horseshoe. *See* Pl.'s Resp Br. at 5; PSOF ¶ 29. But Brandt raises no further argument about this check. What's more, there is no evidence in the summary-judgment record that Horseshoe ever received or knew about the cashier's check. Instead, Player endorsed the check to his personal banking account, writing "Not to be used for purposes intended." PSOF ¶ 29; R. 116-9, Pl.'s Exh. 29. The $167,000 check that Horseshoe received from Player on the same day was from his personal checking account; it was *not* the cashier's check. PSOF ¶ 30; R. 116-10, Pl.'s Exh. 30B at HCH-00055. Although this may be evidence of a fraudulent transfer from EAR to Player, it says nothing about whether Horseshoe accepted the personal check from Player in good faith and without knowledge of EAR's fraud.

at Horseshoe, Brandt believes that Horseshoe should have started an investigation to discover where Player was getting the money to fund his gambling activities. *Id.* at 13.

In response, Horseshoe emphasizes that none of these "red flags" have anything to do with EAR's fraud scheme; instead, they all involve Player and Malone's gambling activities. *See* R. 121, Def.'s Reply Br. at 12-13. As a result, Horseshoe argues that these facts could not have placed Horseshoe on inquiry notice that it should have investigated the underlying transfers from EAR to Player and Malone. *Id.* at 13. In fact, even Brandt's own industry experts testified that the "red flags" they identified in their reports would not have alerted Horseshoe to *EAR*'s fraud. *Id.* at 11; *see also* DSOF ¶¶ 61-62.

Ultimately, this Court need not decide whether these "red flags" prompted a duty for Horseshoe to investigate because even if Horseshoe had investigated, it would not have found anything.[6] *Cf. Bonded*, 838 F.2d at 898 ("Since the inquiry

---

[6]To be clear, there *are* circumstances that give rise to a casino's duty to investigate suspicious gambling activity or to inquire about the source of customers' funding. For example, a casino would be acting in bad faith if it received a warning that a particular customer might be laundering money or if it received a corporate check, as in one of the casino cases that Brandt cites. *See In re Video Depot, Ltd.*, 186 B.R. 126, 134-35 (Bankr. W.D. Wash. 1995) (concluding that a customer's erratic gambling behavior together with the casino's receiving a corporate cashier's check directly from the customer's company gave the casino knowledge of the company's financial troubles and the potential voidability of the cashier's check). Or, as another example, if the chief financial officer of a company provided evidence of an executive's embezzlement to the casino, the casino could not simply ignore the evidence. But the other two casino cases that Brandt cites, *see* Pl.'s Resp. Br. at 11-12, do not support Brandt's argument that casinos have a broad duty to investigate because those cases did not construe § 550, *see In re Armstrong*, 285 F.3d 1092, 1096-98 (8th Cir. 2002) (analyzing "good faith" under 11 U.S.C. § 548(c)); *In re Armstrong*, 217 B.R. 569, 574-77 (Bankr. E.D. Ark. 1998) (same). Moreover, in both cases, the casino was the initial transferee, and therefore, the § 550(b) defense was unavailable. *See In re Armstrong*, 285 F.3d at 1093 (explaining that the individual debtor paid the casino directly); *In re*

would have turned up nothing pertinent to voidability, the Bank's failure to make it does not permit a court to attribute to it the necessary knowledge."). During the time that Player and Malone were regularly gambling at Horseshoe, even EAR's creditors and financial advisors, who had the right to audit EAR's financial records, were not aware of EAR's fraud. Pl.'s Resp. DSOF ¶¶ 12, 17. And even with full access to EAR's financial records, it took the forensic accounting firm FTI Consulting nearly three months to discover any evidence of the fraud at EAR. *Id.* ¶¶ 14, 18. Therefore, no reasonable jury could conclude that Horseshoe would have uncovered EAR's fraud had it investigated.

Brandt disagrees with this conclusion. He believes that if Horseshoe had performed an investigation, it would have had sufficient knowledge that the funds it was receiving from Player and Malone were voidable. First, Brandt argues that the voidability of these transfers would have been obvious if Horseshoe had reviewed its own internal records. Pl.'s Resp. Br. at 13-14. According to Brandt, Player's actual losses were significantly less than the checks he wrote to cover his markers. *Id.* at 13. Brandt argues that over $6 million worth of Player's chips simply disappeared. *Id.* at 13-14. Together with the evidence that Player was walking with chips and passing chips, Brandt believes that these "missing" chips should have indicated to Horseshoe that Player was laundering money through the casino. *Id.* at 14.

This argument suffers from both factual and legal flaws. As a factual matter, Brandt's expert admits that this $6 million figure is not accurate because it does not

*Armstrong*, 281 B.R. at 572-73 (explaining that the individual debtor or his law firm paid the casino directly).

include the redemption of chips that were not reportable, that is, were below a certain threshold, and it also does not include every instance when Player redeemed chips. *See* Def.'s Resp. PSOF ¶ 23; *see also* R. 123-4, Def.'s Exh. D, Seddio Dep. at 145-46, 151-52, 158-61. As a legal matter, even assuming that these "missing" chips demonstrate that *Player*'s gambling activity was suspicious, they have nothing to do with EAR and EAR's fraud. *Cf. Bonded*, 838 F.2d at 898 (instructing courts to analyze whether the subsequent transferee had notice of the *debtor*'s "financial peril").

Next, Brandt argues that a simple Internet search would have turned up sufficient evidence to indicate that the transfers from Player were potentially voidable. Pl.'s Resp. Br. at 14. Brandt points to a single online article from a website called "Leasing News" about Player's criminal history. *Id.*; *see also* R. 116-12, Pl.'s Exh. 32C, Brandt Aff., Exh. A, Leasing News Article. The article reveals that Player has a criminal conviction for leasing fraud at Greyhound Leasing, a leasing business that Player worked for before he founded EAR. *See* Leasing News Article at 4. Brandt explains that he found the article by entering "Sheldon Player" into Google's search box. Brandt Aff. ¶ 4.

But Brandt has not laid an adequate foundation for this article's evidentiary admissibility. Although the print-out of the article bears a purported date of publication of May 4, 2007, s*ee* Brandt Aff., Exh. A at 1, that date does not mean that an Internet search in 2007 would have uncovered this article. In fact, Brandt explains that he did not find the article until he performed a Google search

sometime after October 2009 when EAR filed its Chapter 11 petition. *See* Brandt Aff. ¶¶ 3-4. And Judy Hale, Player's Horseshoe executive host, testified that she performed an Internet search about Player before late 2009 and was unable to find anything other than information about Player's company. *See* R. 116-12, Pl.'s Exh. 32A, Hale Dep. at 137. What's more, even assuming that Horseshoe would have found this article in 2007, it is unreasonable to conclude that the article would have given Horseshoe any reason to assume that there was an ongoing fraud scheme at Player's new company, EAR. For example, the article does not say when the Greyhound Leasing problem arose. Instead, it only cites a newspaper article from 1985. *See* Leasing News Article at 4-5. It would therefore be unreasonable to conclude from this old fraud conviction alone that Player was engaging in fraud again at EAR.

In sum, Horseshoe has shown that a reasonable jury must find that Horseshoe took the transfers from Player and Malone for value, in good faith, and without knowledge of EAR's fraud. The Court therefore grants summary judgment on Counts I and II.

### B. Count III

Turning last to the two checks totaling $30,000 that Malone gave to Horseshoe from the Charter One account, Brandt argues that the good-faith defense does not shield Horseshoe because it was not a subsequent transferee for these payments. Instead, Brandt contends that Horseshoe was the initial transferee for these two transfers. *See* Pl.'s Resp. Br. at 7.

17

The distinction between "initial" and "subsequent" transferee is important because it determines whether the good-faith defense is available. If a party is an "initial transferee," the trustee (or plan administrator) can automatically recover the transferred property; there is no defense. But if a party is a subsequent (either an immediate or mediate) transferee, then that party may have a defense under § 550(b) and be shielded from liability. *See* 11 U.S.C. § 550(b) (providing a defense only for immediate and mediate transferees as listed in § 550(a)(2)). Although the Bankruptcy Code does not define "initial transferee," the Seventh Circuit has explained that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded*, 838 F.2d at 893. Courts have come to call this standard the "dominion and control" test. *See, e.g., In re Incomnet, Inc.*, 463 F.3d 1064, 1071 (9th Cir. 2006) (listing cases). Logically then, the "initial" transferee is the first entity or person after the debtor to have dominion or control over the money. *See In re Ausman Jewelers, Inc.*, 177 B.R. 282, 286 (Bankr. W.D. Wis. 1995). Simply put, to be an initial transferee, the transferee must have received something it can "call its own." *Bonded*, 838 F.2d at 893.

Brandt argues that Horseshoe was the initial transferee of the $30,000 because he believes that EAR transferred the $30,000 directly to Horseshoe from the "Malone/EAR" Charter One account. Pl.'s Resp. Br. at 7. Brandt also points out that Horseshoe actually believed that the Charter One account was a business account. *See id.* at 5; *see also* PSOF ¶ 28. It is true that Horseshoe's database

system had a note in Player's file instructing casino employees not to accept checks from the Charter One account because it was a "business account." *See* R. 116-8, Pl.'s Exh. 28A, Guerrero Dep. at 84, 92, 149-50; R. 116-8, Pl.'s Exh. 28B at HCH-00617. But what Horseshoe believed about the Charter One account does not help determine whether Horseshoe was an initial transferee.

Under the dominion and control test that the Seventh Circuit articulated in *Bonded*, the question is whether Malone had dominion and control over the EAR funds once the funds were in the Charter One account. In this case, when EAR transferred money to the Charter One account, Malone was able to do whatever she wanted with those funds. As Brandt admits, the Charter One account was Donna Malone's personal account, and she was the only signatory on that account. Pl.'s Resp. DSOF ¶ 10. She was therefore the "initial" party to exercise control over the transferred funds after EAR transferred them to her. What's more, Brandt offers no evidence suggesting that EAR continued to exercise control over the funds in the Charter One account. *Malone* was therefore the initial transferee of this $30,000, *not* Horseshoe.

To avoid this conclusion, Brandt argues that his admission that the Charter One account was Malone's personal account does not also mean that the account was not an EAR account. *Id.* Brandt is incorrect. It is true that when EAR was a "doing business as" entity, Player and Malone used the Charter One account for their business. But a "'[doing business as]' designation does not create an entity distinct from the person operating the business." *Grinnell Mut. Reinsurance Co. v.*

*Haight*, 697 F.3d 582, 587 (7th Cir. 2012). That means that when EAR was solely a "doing business as" entity, EAR was really just a fictitious name that Player and Malone used for their business as individuals. So the name on the Charter One account—"Donna Malone doing business as EAR"—really means that the account was Donna Malone's, not EAR's. EAR later incorporated and, at that point, became an entity separate from Player and Malone. Most importantly, once EAR incorporated, it no longer used the Charter One account, as Brandt admits. Pl.'s Resp. DSOF ¶ 10. In other words, EAR—as an incorporated entity separate and distinct from Malone—has never had dominion and control over the Charter One account. Therefore, once EAR transferred funds into Malone's EAR account, Malone, *not* EAR, had dominion and control over the funds. Malone was therefore the initial transferee—the first transferee to have dominion and control. Logically then, Horseshoe was a subsequent transferee for the $30,000, and § 550(b) is available as a defense to liability.

Just as with Counts I and II, the Court need not definitively resolve whether Horseshoe had a duty to investigate the two transfers totaling $30,000. To be sure, both checks listed "E.A.R." under Malone's name, making it reasonable for Horseshoe to assume that these checks came from a business account. *See* R. 100, Def.'s Exh. A, Malone Aff., Exh. B. (Remember that Malone had listed EAR as her employer on her Horseshoe credit application. *See* R. 105-2, Def.'s Exh. R.) But if Horseshoe had investigated the Charter One account, it would only have learned that it was Malone's personal account. In fact, at the time she made these two

transfers in 2007, EAR no longer used the account or had any authority to control it. Pl.'s Resp. DSOF ¶ 10. Therefore, Horseshoe also accepted the $30,000 in good faith because it would not have learned anything about EAR's fraud had it inquired about the Charter One account. Summary judgment is granted on Count III as well.

## IV. Conclusion

For the reasons stated above, the Court grants Horseshoe's motion for summary judgment [R. 96] on all counts.


ENTERED:


      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: May 15, 2014